513 A.2d 1371

**COMMONWEALTH of Pennsylvania, Appellee,**

**v.**

**Clifford SMITH, Appellant.**

Supreme Court of Pennsylvania.

Argued Jan. 22, 1986.

Decided July 29, 1986.

Reargument Denied Oct. 6, 1986.

344

John J. Kerrigan, Newtown, for appellant.

Michael J. Kane, Dist. Atty., Alan M. Rubenstein, Asst. Dist. Atty., Doylestown, Stephen B. Harris, Warrington, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

FLAHERTY, Justice.

On November 22, 1983, in a trial by jury in the Court of Common Pleas of Bucks County, the appellant, Clifford

Smith, was found guilty of murder of the first degree. A separate sentencing hearing was then held, as required by 42 Pa.C.S.A. § 9711, and appellant was sentenced to death. The instant direct appeal ensued.

The incident from which the conviction arose was one in which appellant committed armed robbery at a pharmacy, and, in the course of doing so, shot and killed the pharmacist. The facts and supporting testimony consisted of the following.

On Friday, June 17, 1983, at approximately 4:15 p.m., two black males, Clifford Smith and Roland Alston, entered the premises of the Parke-Woodburne Apothecary in Levittown, Bucks County, for the purpose of committing an armed robbery. Once inside the store both Smith and Alston separated under the pretense of examining merchandise. After waiting for the customers in the pharmacy to leave, Alston approached a clerk, Doris Forney, displayed a handgun, and ordered her and the proprietor/pharmacist, Richard Sharp, to lie upon the floor. Alston then ordered both Forney and Sharp to close their eyes, whereupon Alston and Smith began removing jewelry from them. Both Forney and Sharp were warned that they would be shot if they offered any resistance. Money was also taken from the store's cash register.

While this robbery was in progress a customer, Casimir Splet, entered the pharmacy. Splet was immediately accosted by the robbers and was ordered to lie upon the floor. Splet's wristwatch and wallet were then forcibly removed from him. Forney and Sharp were lying next to each other with their legs touching as the forcible removal of their money and jewelry was taking place. They were unaware at that time that Splet had entered the premises and become a robbery victim. After the robbery had apparently been completed, and while the victims were still lying on the floor, Forney and Splet heard one loud shot. According to Forney, she could feel the smoke from the gunshot in her face and could smell the powder from the discharge of the weapon. While her eyes were closed, she could feel that

the tremor in Sharp's legs had stopped. Both Forney and Splet then heard footsteps leaving the premises and heard the door open and then close. When Forney opened her eyes she saw Sharp, a pool of blood around his head, and pieces of skull and brain matter in the immediate vicinity of his body. Both Forney and Splet were able to make a positive identification of Alston as one of the robbers.

According to the expert testimony of the Chief Deputy Medical Examiner for the City of Philadelphia, an autopsy upon the person of Sharp revealed that he had been fatally shot with a .38 caliber bullet. Testimony was also produced concerning the path of the bullet and the point of impact, and indicated that Sharp had been shot in the back of his head. Massive damage was done to Sharp's skull from the penetration of the bullet, and the damage was described as having been caused by a "hard contact" discharge with the muzzle of a handgun practically touching Sharp's head.

Eyewitnesses were present in the area of the pharmacy before, during, and immediately after the murder of Sharp. Among these was Thelma Cline, a woman who was seated outside on the sidewalk. Cline identified both Alston and Smith as the persons who entered the store and who, after being inside for a few minutes, left the premises through the same front doorway and ran away from the pharmacy. Also testifying was John McGrory, an employee of a convenience store located in the same shopping center as the pharmacy. McGrory identified both Alston and Smith as the two individuals who had entered the convenience store prior to the murder of Sharp, and who, after remaining in the convenience store for a few minutes, left the store and headed in the direction of the pharmacy. Also testifying was Gerald Gowen. Gowen was driving his car down a road adjacent to the shopping center immediately after the robbery/murder occurred. Gowen as well was able to make a positive identification of both Alston and Smith, inasmuch as both of these individuals had run across the road directly in front of Gowen's car, and Gowen gave a descriptive identification of the vehicle to which they fled. All of these

witnesses, Cline, McGrory, and Gowen also identified the clothing worn by Alston and Smith. This clothing (shorts, sneakers, Phillies baseball cap, a 76'ers painter's cap, etc.) was later recovered at two separate residences in Philadelphia, one being the home of Frances Atkins and the other being the home of Bernadette Cheryl Yancey. At trial both Atkins, a girlfriend of Smith, and Yancey, a girlfriend of Alston, testified that Smith and Alston placed their clothes inside each location just hours after the instant homicide. The clothing worn by Alston during the robbery/murder, a black "Trax" jogging suit with red piping, was seized from Alston's person at the time of his arrest in Philadelphia on June 22, 1983 and was also positively identified by the eyewitnesses.

The jewelry taken from Splet, Forney, and Sharp (distinctive items easily identifiable such as unique rings, religious medals, neck chains, watches, etc.) was later recovered via a search warrant at the Yancey residence and/or from Yvette Barrow, another girlfriend of Smith's who together with Yancey had accompanied both Alston and Smith in the vehicle used during the robbery/murder. According to the testimony of eyewitnesses and the testimony of Yancey and Barrow themselves, Yancey and Barrow waited in Barrow's vehicle near the pharmacy while Alston and Smith exited from the vehicle and committed the robbery/murder.

Both Barrow and Yancey testified at trial on behalf of the Commonwealth. They related that both were driving around with Alston and Smith on the day of the robbery/murder, and they further reported that prior to driving from Philadelphia to Bucks County conversations were heard between Alston and Smith in which Alston and Smith discussed their urgent need to obtain money. Both witnesses also testified that Alston and Smith each had handguns with them. There was also testimony that Alston and Smith drove with them to the area of the shopping center where the pharmacy was located, at which time Alston and Smith discussed robbing the pharmacy. Both witnesses also testified to Alston's instructions to wait alongside the

roadway with the vehicle's "flashers" on while Alston and Smith left the vehicle to enter the pharmacy. Yancey and Barrow also related conversations held between Alston and Smith after the shooting. These conversations concerned the shooting of Sharp and the division of the jewelry and money taken during the robbery. During these conversations, Alston said that Smith had shot the pharmacist and Alston criticized Smith for having done so, and Smith admitted to having shot Sharp but said that he "had to" do it because "the guy lifted his head." Thus, it was established that the shooting was intentional rather than accidental.

In addition to the eyewitness testimony and the testimony of Yancey and Barrow, the Commonwealth produced certain scientific and demonstrative evidence, e.g., a comparison of fibers found on Smith's sneakers showing that they were microscopically indistinguishable from carpet fibers from the pharmacy, latent fingerprint evidence from Alston found at the scene of the crime as well as latent fingerprint evidence from Smith found upon the Barrow vehicle, serology evidence indicating the presence of human blood upon Smith's sneakers, and ballistics evidence demonstrating that unfired cartridges found at the Yancey home had been loaded into, extracted, and ejected from a pistol possessed by Alston at the time of the robbery/murder.

In *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 26, 454 A.2d 937, 942 n. 3 (1982), cert. denied, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), this Court stated that in each death penalty case a determination would be made by this Court as to whether there was sufficient evidence to sustain the conviction for murder of the first degree. In the instant case, the evidence of appellant's guilt is so overwhelming that no serious question can be posed as to its sufficiency. Indeed, the conviction is supported by physical evidence as well as by the testimony of numerous eyewitnesses, including those who observed appellant at the scene of the crime and those who accompanied appellant in the getaway vehicle, the latter witnesses having even pro-

vided testimony that Smith admitted having intentionally shot the pharmacist.

■ Appellant Smith's first contention is that the trial court erred in permitting prospective jury members to be "death qualified." During the jury selection process, the prosecution challenged for cause five prospective jurors who stated that they could not vote for the death penalty under any circumstances. Exclusion of those jurors from the panel, appellant argues, resulted in the selected jury being conviction prone, in violation of Sixth and Fourteenth Amendment rights to an impartial jury selected from a representative cross-section of the community. We find no merit in this contention. This Court has repeatedly held that the "death qualification" process is consistent with constitutional trial guarantees. *Commonwealth v. Colson,* 507 Pa. 440, 453, 490 A.2d 811, 817–818 (1985); *Commonwealth v. Szuchon,* 506 Pa. 228, 257, 484 A.2d 1365, 1380–1381 (1984); *Commonwealth v. Maxwell,* 505 Pa. 152, 165, 477 A.2d 1309, 1316 (1984), cert. denied, 469 U.S. 971, 105 S.Ct. 370, 83 L.Ed.2d 306 (1984); *Commonwealth v. Travaglia,* 502 Pa. 474, 503 n. 2, 467 A.2d 288, 302–303 n. 2 (1983), cert. denied, 467 U.S. 1256, 104 S.Ct. 3547, 82 L.Ed.2d 850 (1984); *Commonwealth v. Brown,* 462 Pa. 578, 590, 342 A.2d 84, 90 (1975). See also *Lockhart v. McCree,* — U.S. —, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986); *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841, 851–852 (1985) (prospective juror in capital case whose views on death penalty would prevent or substantially impair performance of duties as juror held subject to exclusion for cause).

■ Appellant's second contention is that the trial court erred in admitting the testimony of Barrow and Yancey as to the statements made by co-defendant Alston in the getaway vehicle after the robbery/murder, such statements having been ones in which Alston criticized appellant for having shot the pharmacist. It is argued that such statements were not made in furtherance of a conspiracy, because the robbery/murder had already been completed, and,

thus, that they were not admissible under the exception to the hearsay rule permitting the use at trial of declarations of a co-conspirator. See *Commonwealth v. Evans,* 489 Pa. 85, 92–93, 413 A.2d 1025, 1028–1029 (1980) (declarations of co-conspirator admissible provided declarations were made during the conspiracy and in furtherance of the common design). We find no merit in the assertion that the statements in question were not made in the furtherance of a conspiracy, for the statements were made in the course of flight from the scene of the crime and in the concurrent course of dividing up the proceeds of the robbery. Flight from the crime scene and division of the robbery proceeds were certainly parts of a common design to carry out the robbery, and, thus, the statements in question were properly admitted as having been made in the course of carrying out the design of the conspiracy.

The third claim raised by appellant is that error was committed in allowing Atkins to testify at trial. According to appellant, Atkins was his common law wife and her testimony should have been barred by the rule of marital incompetency, which prevents spouses from testifying against each other in criminal proceedings. The basis for invoking the marital privilege is the existence of a valid marriage. *Commonwealth v. Maxwell,* 505 Pa. at 164–165, 477 A.2d at 1315–1316. The record supports the finding of the trial court, however, that the common law marriage alleged in the present case did not in fact exist. Although Atkins testified initially at an in camera competency hearing that she was appellant's common law wife, cross-examination of Atkins revealed that she meant only that she cohabited with appellant and that her relationship with appellant had produced two children. Atkins also admitted having told the prosecutor and a police detective that appellant was merely her "boyfriend" rather than her husband. It is well established that a common law marriage must be created by an exchange of words in the present tense, verba de praesenti, spoken with the specific purpose that the legal relationship of husband and wife be thereby created. *Gower*

*Estate,* 445 Pa. 554, 556, 284 A.2d 742, 743 (1971). The record indicates that no such exchange of words occurred between Atkins and appellant. Upon this record, the trial court had ample basis for determining that Atkins was not appellant's common law wife, and, thus, that Atkins should be permitted to testify.

■ Appellant next argues that, after the determination was made that Atkins was not precluded by marital incompetency from testifying against appellant, error was committed when, during Atkins' trial testimony, the prosecution was permitted to plead surprise and to proceed to cross-examine Atkins as though Atkins were not the prosecution's own witness. It is established that counsel may cross-examine his own witness on a plea of surprise when the witness has given testimony which was unexpected, contradictory to statements which the witness had made earlier, and harmful to the party calling the witness and beneficial to the opposing side. *Commonwealth v. Waller,* 498 Pa. 33, 37–39, 444 A.2d 653, 655–657 (1982). In addition, our courts have been liberal in allowing a party to cross-examine his own witness when it is believed that the interests of truth and justice so require. *Id.,* 498 Pa. at 39, 444 A.2d at 656.

■ Applying these principles to the present case, it is clear that the prosecution was properly permitted to cross-examine its own witness. Just moments before Atkins was called as a prosecution witness, Atkins testified at the in camera witness competency hearing that she remembered having given a statement to the prosecutor and to a police detective to the effect that she had received a telephone call from appellant after the crime and that during that call appellant stated, "I shot him first. The man was going for his gun in the cash register; that's why I shot him. I had to shoot him first." Although other evidence at trial established that the pharmacist was laying on the floor when he was shot in the back of his head, the prosecution nevertheless sought to introduce Atkins' testimony as evidence that appellant admitted to having committed a shooting. Thus,

Atkins was called as a witness, but, when questioned about her telephone conversation with appellant, Atkins testified that appellant told her that he had drawn his gun only after a gun had already been drawn against him, and Atkins denied that appellant had told her that he had committed a shooting. This testimony was in direct contradiction to the statement which Atkins had earlier given, and it was contrary to the testimony which Atkins had given just moments before at the in camera proceeding. The prosecution pled surprise, and was permitted to cross-examine Atkins regarding her prior inconsistent statement. On appeal, appellant concedes that Atkins' testimony contradicted her prior statement and that Atkins' testimony was detrimental to the prosecution's case. At issue is simply whether or not the change in her testimony was sufficiently unexpected as to support a plea of surprise.

It is the contention of appellant that it should have been no surprise to the prosecution when Atkins testified at trial contrary to her prior statement, because during the in camera witness competency hearing Atkins testified in certain respects contrary to the prior statement. Examination of the transcript of that hearing, however, reveals that Atkins contradicted the prior statement only insofar as her assertions as to whether she was appellant's common law wife. In her statement, Atkins said she was not appellant's wife. At the hearing, however, Atkins stated that she had a common law marriage with appellant. The transcript reveals that, while disagreeing with her earlier statement as to her marital status, Atkins nevertheless proceeded to confirm the accuracy of her statement as to the admissions appellant made to her about having committed a shooting. In view of this fact, the prosecution had every reason to expect that Atkins would testify in a manner consistent with that statement, as to the shooting, when called as a witness. When Atkins' testimony at trial proved to be other than was expected, the prosecution quite reasonably pled surprise, and the trial court committed no error in allowing the prosecution to cross-examine its own witness.

■ The fifth claim of error raised by appellant is that the trial court erred in excluding a question which defense counsel sought to ask during voir dire. Specifically, it is alleged that defense counsel was precluded from posing a question to a prospective juror as to whether he believed that the testimony of law enforcement personnel was more credible than the testimony of non-law enforcement individuals solely because of the former's affiliation. Examination of the record reveals that this allegation of error is patently without merit. Irrespective of whether defense counsel was entitled to make such an inquiry of the potential juror, it is clear from the record that, despite appellant's assertion to the contrary, the inquiry was in fact permitted. Objections were sustained only with regard to the phraseology of defense counsel's question. Immediately after those objections were sustained, however, the trial court rephrased the question and posed it to the prospective juror as follows: "Assuming that two people have the same opportunity to observe and have the same background and training, and one happens to be a police officer and the other happens to be a civilian, would you accept the testimony of the police officer over the other person just because he is a police officer?" Thus, appellant's assertion that the juror was not asked about his views on the credibility of law enforcement personnel is not supported by the record.

■ The sixth claim of error asserted by appellant is that the trial court erred in refusing to give certain defense requested jury instructions. Fifteen points for charge were submitted by defense counsel. Appellant concedes that twelve of those fifteen points were adequately covered by the trial court's instructions to the jury. As to two of the remaining three points, however, appellant contends that he was entitled to have his suggested instructions delivered to the jury in *verbatim* fashion. Those two instructions pertained to the definition of murder of the first degree and to certain requirements of criminal culpability. It is established that a trial court is not required to accept points submitted by counsel verbatim, but rather is free to select

its own forms of expression. *Commonwealth v. McComb*, 462 Pa. 504, 509, 341 A.2d 496, 498 (1975). "The only issue is whether the area is adequately, accurately and clearly presented to the jury for their consideration." *Id.* We have reviewed the record in the present case and find no inadequacies in the trial court's instructions as to elements of the crime of murder of the first degree and as to pertinent requirements of criminal culpability.

The remaining point for charge in connection with which appellant alleges an error by the trial court is that in which defense counsel requested an instruction on involuntary manslaughter. The requested instruction was denied on grounds that such an instruction would have had no legitimate relation to the evidence presented at trial. We agree that the denial of that instruction was proper. See *Commonwealth v. Williams*, 490 Pa. 187, 415 A.2d 403 (1980); *Commonwealth v. White*, 490 Pa. 179, 415 A.2d 399 (1980). As stated in *Commonwealth v. White*, 490 Pa. at 182, 415 A.2d at 400, "It has long been the rule in this Commonwealth that a trial court should not instruct the jury on legal principles which have no application to the facts presented at trial." Further, regarding the situation where an involuntary manslaughter instruction is requested during a trial for murder, it has been held that the "involuntary manslaughter charge shall be given only when requested, and where the offense has been made an issue in the case and trial evidence reasonably would support such a verdict." *Commonwealth v. Williams*, 490 Pa. at 190, 415 A.2d at 404. The evidence presented in the instant trial clearly did not support any reasonable inference that the death of the pharmacist was the result of reckless or grossly negligent behavior attributable to appellant. Rather, the evidence overwhelmingly indicated that appellant intentionally shot and killed the pharmacist. Under these circumstances, appellant was not entitled to an instruction on involuntary manslaughter.

Appellant's seventh claim of error is that the Chief Deputy Medical Examiner for the City of Philadelphia

should not have been permitted to testify as an expert witness giving his opinion as to the caliber of bullet which caused the death of the pharmacist. We disagree. The Chief Deputy Medical Examiner was eminently qualified as an expert witness, having been affiliated with the Philadelphia Medical Examiner's office for more than twenty-three years, and, in the role of a forensic pathologist, having performed in excess of nine thousand autopsies to determine the causes and mechanisms of death. The witness did not, by giving his opinion as to the caliber of bullet which struck the pharmacist, give opinion testimony on a subject which was outside his realm of expertise. The witness was not asked to identify any particular bullet or to identify any particular gun as having been used in the crime.

An opinion regarding the size of the projectile which would be expected to have caused the wounds that the witness had observed and described was particularly within the witness' expertise, because knowledge of traumatic injuries and the forces required to produce them were requisite to rendering such an opinion. Familiarity with the effects of bullets upon the human anatomy was, of necessity, an integral part of the experienced Chief Deputy Medical Examiner's knowledge. Thus, we do not agree with appellant's contention that a ballistics expert, rather than a forensic pathologist, should have been utilized as the source of opinion testimony regarding the nature of the projectile that caused the wound. This is in keeping with prior decisions of this Court which have held admissible the testimony of expert medical witnesses, who, although not specifically qualified as ballistics experts, have, based upon an examination of a gunshot wound, formed an opinion as to certain ballistics aspects of the cause of the wound. *Commonwealth v. Gonzales*, 463 Pa. 597, 602–603, 345 A.2d 691, 694 (1975) (medical doctor/coroner permitted to give opinion regarding distance from which shot was fired); *Commonwealth v. Santos*, 275 Pa. 515, 526–527, 119 A. 596 (1923) (examining physician permitted to give opinion as to

direction and distance of shot, as well as the position of the parties).

■ Appellant's eighth claim of error is that, at the conclusion of the Commonwealth's evidence, the trial court erred in refusing to sustain a defense demurrer to the charge of murder of the first degree. It is axiomatic that "[t]he test to be applied in ruling on a demurrer is whether, accepting as true all of the prosecution's evidence and all reasonable inferences therefrom, it is sufficient to support a finding by the factfinder that the defendant is guilty beyond a reasonable doubt." *Commonwealth v. Turner*, 491 Pa. 620, 622, 421 A.2d 1057, 1058 (1980). As discussed *supra.*, the evidence was more than sufficient to sustain appellant's conviction for murder of the first degree. The defense demurrer was, therefore, properly denied.

■ The final issue to be considered in the instant appeal concerns the imposition of the death sentence. At the penalty stage of this trial the prosecution introduced evidence that, in addition to the present conviction for a murder committed in the course of a robbery, appellant had, prior to commencement of the instant trial, been convicted of two additional felonies. Both of the latter convictions were for aggravated assaults. Subsequently, the jury found, upon an ample evidentiary basis, that there were present two of the aggravating circumstances specified in the sentencing statute. The aggravating circumstances found to be present were that appellant "committed a killing while in the perpetration of a felony," 42 Pa.C.S.A. § 9711(d)(6), and that appellant "has a significant history of felony convictions involving the use or threat of violence to the person," 42 Pa.C.S.A. § 9711(d)(9). Further, the jury found that none of the mitigating circumstances specified in 42 Pa.C.S.A. § 9711(e) were present. A review of the record reveals that the defense offered virtually no evidence of mitigating circumstances. When one or more aggravating circumstances are present, and no mitigating circumstances are found, the jury is required to return a

verdict of death. 42 Pa.C.S.A. § 9711(c)(1)(iv). Accordingly, appellant was sentenced to death.

We have examined the record of the proceedings below, and have determined that the sentence of death imposed in this case was not the "product of passion, prejudice or any other arbitrary factor," 42 Pa.C.S.A. § 9711(h)(3)(i), and that the evidence does not fail "to support the finding of an aggravating circumstance specified in subsection (d)." 42 Pa.C.S.A. § 9711(h)(3)(ii).

In accordance with our duty, under 42 Pa.C.S.A. § 9711(h)(3)(iii), to review sentences of death from the standpoint of their proportionality to sentences imposed in similar cases, *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 63, 454 A.2d 937, 961 (1982), cert. denied, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), we have reviewed the sentence imposed upon appellant in light of sentencing data compiled and monitored by the Administrative Office of Pennsylvania Courts. See *Commonwealth v. Frey*, 504 Pa. 428, 443, 475 A.2d 700, 707–708 (1984), cert. denied, 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984). Our review of cases wherein the aggravating circumstances set forth in subsections (d)(6) and (d)(9) were present, and where no mitigating circumstances were present, such being the circumstances of the present case, discloses that a death sentence has been imposed in eight of nine cases. Thus, appellant's sentence of death is neither excessive nor disproportionate to the penalties imposed in similar cases.

Judgment of sentence affirmed.

NIX, C.J., files a concurring opinion in which ZAPPALA, J., joins.

NIX, Chief Justice, concurring.

I regret that the majority is still unwilling to reconsider the argument that the death qualification process creates juries which are prosecution-prone and unrepresentative of the community. *See Commonwealth v. Simon*, 509 Pa. 548, 506 A.2d 392 (1986) (Nix, C.J., and Zappala, J., dissent-

ing statements); *see also Commonwealth v. Maxwell,* 505 Pa. 152, 170, 477 A.2d 1309, 1319 (Nix, C.J., dissenting), *cert. denied,* 469 U.S. 971, 105 S.Ct. 370, 83 L.Ed.2d 306 (1984). However, since it appears that the procedure will remain the law of this Commonwealth until some other tribunal sees the wisdom of this argument, I therefore concur in the result.

Justice Zappala joins in this concurring opinion.