549 A.2d 918

**COMMONWEALTH of Pennsylvania**

v.

**Ricky R. NISSLY, Appellant.**

Superior Court of Pennsylvania.

Argued June 29, 1988.

Filed Sept. 16, 1988.

Reargument Denied Nov. 10, 1988.

John J. Duffy, West Chester, for appellant.

James J. Karl, Assistant District Attorney, Lancaster, for Com., appellee.

Before TAMILIA, KELLY and HESTER, JJ.

TAMILIA, Judge:

Appellant was convicted by a jury of murder of the third degree in the death of his eleven week old son, Jeremiah. Post-trial motions were filed and denied by Order of the trial court dated November 10, 1987 and appellant was sentenced on January 8, 1988 to pay a fine of five hundred dollars ($500) and was placed on probation for a period of five years. This appeal is from that judgment of sentence.

Jeremiah was born on January 30, 1986, weighing only two pounds, five ounces, after being prematurely delivered through an emergency cesarean section. He was cared for in the hospital until March 24, 1986 when he went home to live with his father, mother and two sisters at his grandparents' residence. On April 18, 1986, Jeremiah was found dead in his bassinet by his grandfather, appellant's father.

The medical testimony offered at trial by the Commonwealth was uncontroverted—Jeremiah died from a brain hemorrhage which could only have resulted from a violent shaking. The autopsies which were conducted following Jeremiah's death also revealed he had suffered eight fractures of his extremities and at least thirty fractures of his ribs, all of which occurred no more than four weeks before his death with most occurring much closer to his death. Other than the hemorrhage which caused his death, Jeremiah had suffered two previous brain hemorrhages, one being several days old and the other being several hours old. Expert testimony established the time of Jeremiah's death was most likely between 4:00 and 5:00 a.m. The experts concluded, therefore, the injury occurred one-half hour to an hour prior to death or between 3:00 and 4:30 a.m. Appellant testified he worked on his motorcycle engine on the evening of April 17 until 2:30 or 3:00 a.m. of the next morning. The others in the house at that time, appellant's wife, two daughters, father, grandfather and two cousins, had gone to bed earlier. When appellant finished working on the engine, he went inside to go to bed but found his wife up with their two daughters who were crying. Appellant tried to help his wife calm down the girls but they would not stop crying. Jeremiah was downstairs in the living room in his bassinet crying so appellant moved him to the family room which was further away from the upstairs bedroom, next to the garage. Jeremiah usually slept in the living room and appellant put him back in the living room after moving him to the family room because appellant felt uneasy about leaving him in the family room. Jeremiah continued to cry but less loudly after appellant held him so appellant went upstairs to bed. He was last with the child between approximately 3:30 and 3:40 a.m. He was awakened at 7:00 a.m. by his father saying something was wrong with Jeremiah. When appellant went down to check the baby, he was dead.

Appellant raises four issues for our review: 1) whether the inference of guilt permitted under *Commonwealth v. Paquette*, 451 Pa. 250, 301 A.2d 837 (1973) is applicable; 2)

whether evidence of the past injuries suffered by Jeremiah was admissible; 3) whether Article I, § 9 of the Pennsylvania Constitution ensures advocate review of children and youth agency files; and 4) whether evidence tending to show consciousness of guilt by someone other than appellant should have been admitted.

Appellant's first claim is the Commonwealth was required to prove, according to *Paquette, supra,* he had *exclusive* control over Jeremiah during the time the fatal injuries were inflicted; without proving beyond a reasonable doubt appellant had exclusive custody and control of the infant, *Paquette* cannot be relied on by the prosecution. Appellant asserts he did not have exclusive control over Jeremiah throughout the time period the fatal injury could have been inflicted. Several other people were also in the house during that time and any one of them could be responsible for the injury which led to Jeremiah's death.[1]

It is true the Commonwealth need not prove its case directly since "[c]ircumstantial evidence can be as reliable and persuasive as eyewitness testimony and may be of sufficient quantity and quality to establish guilt of a crime beyond a reasonable doubt," *Commonwealth v. Buehl,* 510 Pa. 363, 508 A.2d 1167 (1986).

■ Under *Paquette, supra,* an inference of guilt is permissible where the infant had been in the *sole* custody of

---

1. Appellant argues the Commonwealth did not eliminate the other logical suspects, stating:

    [O]f the seven people other than the defendant and his son who spent the night of April 17th in the Nissly household, the Commonwealth failed to elicit unequivocal denials from four. Jessica and Danielle Nissly, ages 2½ and 1 respectively, never testified. The Commonwealth relied exclusively upon expert testimony that it was "extremely unlikely" that a child of 2½ years or less could have inflicted the injury to the brain. (R. 494a). On cross examination, Mary Beth Nissly admitted that she "could have" gotten up during the night at some time but did not recall. (R. 123a). As to Peter Bitsoli, Rick Nissly's grandfather [Jeremiah's great grandfather], the Commonwealth merely read a statement into evidence that Mr. Bitsoli retired at 10:30 p.m. and "got up" at 10:00 a.m. on April 18, 1986 (R. 95a). The statement itself did not contain a denial of guilty and, in fact, there was evidence that Mr. Bitsoli fled Lancaster County shortly after Jeremiah's death. (R. 631–32a).

the suspect and the injuries were inflicted *during that time.* Our Supreme Court in *Commonwealth v. Turner,* 491 Pa. 620, 421 A.2d 1057 (1980), found the trial court erred in discharging the defendant on a criminal homicide charge for the death of his girlfriend's son where the evidence clearly established defendant had viciously beaten the child throughout the day before the child suffered the fatal blow to the head. Although the Commonwealth had no direct evidence proving defendant inflicted the fatal injury, circumstantial evidence showed the injury was not accidental or self-inflicted and defendant was only one of two people in the home at the time of the injury. The Court stated:

> In light of appellee's earlier vicious beatings of the child, and in light of the extreme unlikelihood of acciden- tal head injuries under the circumstances presented, the evidence, and reasonable inferences therefrom, were clearly sufficient to prove beyond a reasonable doubt that appellant delivered the blows to the child's head.
>
> . . . .
>
> In the instant case, the prosecution's evidence demon- strated that Barbara Miklos went to sleep at 1:30 a.m., at which time Irwin's head was unbruised, and awoke to appellee's screams at 3:45 a.m, at which time the child's head had sustained severe injury. Thus, the sole custody inference is applicable to appellee.

*Id.,* 491 Pa. at 625–26, 421 A.2d 1060.

We rule out appellant's two young daughters as being "logical suspects"; however, appellant's wife, father and possibly the grandfather may be ruled out also since the record established to the satisfaction of the judge and jury that none of them had control over Jeremiah for any of the time period during which the injury was inflicted. This is a matter of credibility and goes to the weight of the evidence. On appellate review of a criminal conviction, we will not weigh the evidence and, therefore, substitute our judgment for the finder of fact. *Paquette, supra,* 451 Pa.

at p. 257, 301 A.2d at p. 841.  Although Jeremiah had obviously been severely physically abused numerous times prior to his death, the Commonwealth did not bring forth any evidence which would conclusively point to appellant as the abuser.  Thus, we cannot use the "pattern of abuse" theory used in *Turner, supra,* in conjunction with the *Paquette* doctrine, to infer appellant committed the act which killed Jeremiah.  However, the *Paquette* doctrine, when applied to the facts of this case, provides an adequate legal basis for the jury verdict.  Apparently no evidence was obtained as to who inflicted the multiple injuries Jeremiah suffered prior to his death, but from the expert medical testimony they could not have been self-inflicted, they were not attributable to a bone deficiency, and because of the various times of occurrence, they were frequent and continuous throughout the few weeks the child was in the home.  At best, the adults were callous and nonresponsive to the treatment of the child and at worst, there is a conspiracy of silence as to the perpetrator of the other injuries.  Notwithstanding, the medical testimony was sufficient to establish the very limited time frame within which the fatal trauma occurred, that is between 3:00 and 4:30 a.m. on April 18, 1986.  This is based upon expert testimony as to the time of injury to the brain stem, which resulted in death, and the time it took for rigor mortis to set in.  As indicated above, as determined by the evidence, as found by the jury, the appellant was the only person in custody of Jeremiah during that time.  Any other conclusion is speculative and would require this Court to weigh the facts differently than the jury, which we may not do.

The second issue concerns the admission of evidence regarding numerous other injuries determined to be sustained by the child prior to the fatal injury.  Appellant sought to bar admission of such evidence which motion was denied.  The court in a cautionary charge to the jury, instructed them the sole purpose for admission of that evidence was "to have the entire picture of what the autopsies disclosed and for no other reason whatsoever."  (T.T.

Volume V, p. 736). We agree the evidence was proper for that purpose. Since the cause of death had to be established, the presence of numerous other injuries occurring within 12 hours to 24 days from the time of death was relevant to pinpoint which injury or injuries caused death and to rule out the possibility that any of the other injuries contributed to or caused the child's death. This was particularly important since the Commonwealth's theory focused on the person in custody at the time the fatal injury occurred. Two things became necessary in that proof; first to rule out all other possible causes of death by establishing the other injuries disclosed by the three autopsies were not fatal; and second, establishing who was in custody at the time the fatal injury occurred. Absent a flagrant abuse of discretion, that determination by the trial court in balancing the probative value of the evidence against its prejudicial impact will not be disturbed on appeal. *Commonwealth v. Murphy*, 346 Pa.Super. 438, 499 A.2d 1080 (1985); *Commonwealth v. Shirey*, 333 Pa.Super. 85, 481 A.2d 1314 (1984).

█ Next appellant alleges the procedure adopted by the trial court in reviewing Children and Youth Services files *in camera* and denying access to appellant is a violation of the confrontation clause of the Pennsylvania Constitution. This procedure has been approved by the U.S. Supreme Court in *Pennsylvania v. Ritchie*, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987). There it was held the balance of the state's interest in confidentiality and the defendant's right to due process is struck by an *in camera* review of the C.Y.S. material by the trial court, after which it may, in its discretion, release information material to the fairness of the trial to the defendant. While this determination was made by the U.S. Supreme Court in relation to the sixth amendment or fourteenth amendment right of confrontation, the court determined that under the fourteenth amendment due process clause, the *in camera* procedure struck a proper balance between the state's interest of confidentiality and the defendants right to information favorable to his

defense. We see no reason to adopt a different standard under the confrontation provision of the Pennsylvania Constitution.

■ Finally, appellant was denied the right to offer his own testimony that his grandfather Peter Bitsoli age 91, left the jurisdiction shortly after Jeremiah's death, forfeiting $5,000 he had given as a downpayment toward a house for appellant and his wife. The testimony was rejected by the court, upon motion by the Commonwealth as to relevancy. Appellant claims the testimony was relevant for the purpose of showing that Peter Bitsoli fled the area out of consciousness of guilt or for the purpose of concealment. The evidence was clear that his whereabouts were never unknown and that the reason he left was pursuant to a family agreement and request by his daughter (appellant's mother) that other relatives care for him temporarily because of the confused family situation and his health problems. After being there for a time he decided to remain because he liked it there. He was never a suspect and apparently had no contact with the child which could lead to any inference that he was involved in any of the injuries including the fatal one. A stipulation was read into the record in which appellant's counsel acknowledged Mr. Bitsoli had nothing to contribute to his side. His testimony was stipulated as being (after an interview in Erie by a detective) "I was there that night. I went to bed. I got up the next morning and the baby was dead."

The defense strategy was to show that there were a number of persons in the home at the time the fatal injury was inflicted on the child and that any of a number of persons, including the grandfather could have inflicted the injury. The evidence clearly establishes that the only person who was with the child at the time the injury was inflicted was appellant and under the *Paquette* rule, this is sufficient for a jury to find beyond a reasonable doubt that he is guilty of the homicide.

Finding no error, we must affirm the verdict of the jury and judgment of sentence.

Judgment of sentence affirmed.