## Commonwealth v. Derk

*John T. Robinson, district attorney,* for the Commonwealth.

*Hugh A. Benson,* for defendant.

WOELFEL, *J.,* May 3, 1993—The defendant faces a five-count information arising from the death of Clair F. Hoyles III, who was two years old at the time of his death. Young Clair was the son of the defendant's paramour and co-defendant, Tamie L. Gates. The offenses with which Mr. Derk is charged are: murder of the first degree, 18 Pa.C.S. §2501(a); murder of the third degree, 18 Pa.C.S. §2502(c); aggravated assault, 18 Pa.C.S. §2702(a)(1); endangering welfare of children, 18 Pa.C.S. §4304; and recklessly endangering another person, 18 Pa.C.S. §2705. The Commonwealth has advised the defendant that if the defendant is found guilty of murder of the first degree the Commonwealth intends to seek the death penalty.

As part of his omnibus motion the defendant seeks to have the information filed against him quashed and the charges dismissed. As to the charges of the first degree, murder of the third degree and aggravated assault that request will be granted.

Pa.R.Crim.P. 306 provides that:

"Unless otherwise required in the interest of justice, all pretrial requests for relief shall be included in one omnibus pretrial motion."

The comment which follows Rule 306 provides that one of the types of relief that may be requested in an omnibus pretrial motion is a request that the indictment or information filed against a defendant be quashed. In that portion of his omnibus motion in which the defendant requests that the information against him be quashed the defendant challenges the

sufficiency of evidence presented against him at the preliminary hearing that was conducted in this matter.

The appropriate method of challenging the sufficiency of the evidence presented at a preliminary hearing at which it was found that the Commonwealth presented a *prima facie* case is to petition the trial court for a writ of habeas corpus. *Commonwealth v. Mormon,* 373 Pa. Super. 360, 541 A.2d 356 (1988); *Commonwealth v. Scott,* 396 Pa. Super. 339, 578 A.2d 933 (1990). The defendant's request that the information be quashed will be treated as a petition for writ of habeas corpus. See *Commonwealth v. Mormon, supra.*

On November 16, 1992, a preliminary hearing was conducted in this matter and the companion case of *Commonwealth v. Tamie Lynn Gates,* no. 186 of 1992. At that preliminary hearing the Commonwealth called three witnesses. Those witnesses were Wayne K. Ross, M.D., a forensic pathologist who conducted an autopsy on Clair F. Hoyles, III, Trooper Beth Wilson of the Pennsylvania State Police, one of the investigating officers who interviewed Ms. Gates, and James W. Hartley, chief of the Borough of Selinsgrove Police Department, another investigating officer. Dr. Ross testified as to his findings as a result of the autopsy that he performed. Clair F. Hoyles, III died on August 7, 1992. Dr. Ross testified that:

"There were so many traumatic injuries of this child, there is severe head trauma, there is severe neck trauma, there is severe abdominal trauma, there is bleeding in the brain, the neck, the top of the neck, the upper spinal column is what we call subluxated, the abdominal region has extensive amount of blood and bleeding, and the tissues which supply the blood to the gastrointestinal tract or the bowel. All of these areas showed severe

trauma, or significant trauma. Any one of those areas could have killed this child." (N.T. 10.)

Dr. Ross also testified that the cause of death was multiple traumatic injuries, that the manner of death was homicide, and that the injuries were not consistent with injuries that would have been self-inflicted by the child. The time of the sustaining of internal head injuries was placed at 24 to 48 hours before the time of death, but it was also noted the child suffered trauma three to five days before the time of death, 24 to 48 hours before the time of death, and hours before the time of death. Dr. Ross also noted fractures of both arms that were approximately four to eight weeks old, as well as a fresh fracture on the left arm that had occurred within days of the child's death.

Trooper Wilson's testimony was very limited and addressed her interview of Ms. Gates, during which Ms. Gates indicated that she believed that "people wanted her to say that Steven did this to the child," and that it was possible that she may have killed her child, but that she really did not remember. (N.T. 46.)

Chief Hartley testified of his being dispatched to the Sunbury Community Hospital on the day of the child's death, of his discussions with Ms. Gates at the hospital, the fact that Mr. Derk was not at the hospital, that the police began to look for Mr. Derk, leaving messages with family members that the police wanted to speak with him, and that Mr. Derk appeared voluntarily at the police station at approximately 4:15 on the afternoon of the child's death. Chief Hartley also testified that he had listened to the tape of a phone call to the Snyder County Communications Center asking that an ambulance be dispatched to the Gates residence, and that he believed that the name given by the caller was Pete Derr. On the date of death Mr.

Derk advised Chief Hartley that Mr. Derk had placed the call to the Communications Center. Chief Hartley also testified that both Mr. Derk and Ms. Gates advised the chief that one or both of them would have had custody or control of the child from approximately July 1, 1992, until the date of the child's death.

There was no testimony at the preliminary hearing that Mr. Derk had ever so much as laid a hand on the child. There was no testimony that Mr. Derk ever assaulted or struck the child. At other proceedings held in this and the Derk matter on March 19, 1993, it was stated on the record that the court was to rely, when making its decision regarding the defendant's motion to quash, on the transcript of the preliminary hearing that had been filed of record in this matter. (The court would note that after the filing by the defendant of his request that the information be quashed the Commonwealth did not avail itself of the opportunity to present any additional testimony in support of the charges against the defendant, as it is permitted to do. See *Commonwealth v. Mormon, supra.*)

At the preliminary hearing, and to date before this court, the Commonwealth has based its case against Mr. Derk on what is referred to in the cases as the "sole custody inference," the argument that:

"Where an adult or adults had sole custody of a child over a period of time and the child suffered, during that time, wounds which were neither self-inflicted nor accidental, the jury may infer that the adult or adults intentionally inflicted the wounds." (Commonwealth's brief contra defendants' motions for habeas corpus relief, page 5)

Before the district justice who conducted the preliminary hearing and before this court the Commonwealth has relied on the following cases to support

its contention: *Commonwealth v. Turner,* 491 Pa. 620, 421 A.2d 1057 (1980); and *Commonwealth v. Nissly,* 379 Pa. Super. 86, 549 A.2d 918 (1988); *Commonwealth v. Paquette,* 451 Pa. 250, 301 A.2d 837 (1983); *Commonwealth v. Rogers,* 265 Pa. Super. 535, 528 A.2d 610 (1987). The Commonwealth has misread those cases. None of the cases cited stand for the proposition that where adults, in the plural form, have sole custody of the child at a time when the child suffers fatal injuries that were neither self-inflicted nor accidental those adults may be found to have inflicted the wounds. Rather, each of those cases stands for the proposition that where an adult, in the singular form, has sole custody of a child for a period of time and the child suffers wounds a jury may then infer that the adult inflicted those wounds.

The leading case on this issue is *Commonwealth v. Paquette, supra.* The Supreme Court of Pennsylvania held that:

"Where, as here, an adult has sole custody of a child for a period of time, and during that time the child suffers wounds which unquestionably are neither self-inflicted nor accidental, the evidence is sufficient to allow a jury to infer that the adult inflicted the wounds." *Commonwealth v. Paquette,* 301 A.2d at 840.

The Supreme Court does not state that when adults have sole custody the jury may infer that the adults inflicted the wounds.

This issue was again addressed by the Supreme Court of Pennsylvania in *Commonwealth v. Turner, supra.* In that case the defendant was charged with criminal homicide in the death of Erwin Liggins Jr., age 21 months. Erwin's mother had been visiting her boyfriend, Mr. Turner. Earlier in the evening Turner had brutally disciplined Erwin with a belt that had a heavy

buckle on it, as well as with a shoe, and then a one-inch thick wooden stick. The mother decided to return to her own home with Erwin and left Turner's home, but missed the last bus to her home, and returned to the Turner residence. She went to bed at approximately 1:30 a.m., and at that time, saw no injuries or marks on Erwin's face or head. Approximately two hours and 15 minutes later she was awakened by Turner's shouts that the child was not breathing. The mother then noticed bruises on the child's head. Twenty-seven minutes later the child was pronounced dead. The coroner and the forensic pathologist testified that the child's death was due to a combination of injuries to both the trunk of his body and to his head. The Supreme Court of Pennsylvania, in reviewing the evidence in *Turner* found as follows:

"In the instant case, the prosecution's evidence demonstrated that [the mother] went to sleep at 1:30 a.m., at which time Erwin's head was unbruised and awoke to [Turner's] screams at 3:45 a.m., at which time the child's head had sustained severe injury. Thus, the sole custody inference is applicable to [Turner]. Here, as in *Paquette,* the evidence is sufficient to allow an inference that appellee inflicted the head wounds." (Footnote and citations omitted) *Id.*, 421 A.2d at 1060.

The issue is again addressed in *Commonwealth v. Nissly,* 379 Pa. Super. 86, 549 A.2d 918 (1988). The facts of this case are critical to the analysis of the sole custody inference, as that inference may lawfully be applied. Therefore, those facts will be set forth at length, as they are in the opinion of the Superior Court of Pennsylvania.

"The medical testimony offered at trial by the Commonwealth was uncontroverted—Jeremiah died from a brain hemorrhage which could only have resulted from

violent shaking. The autopsies which were conducted following Jeremiah's death also revealed he had suffered eight fractures of his extremities and at least 30 fractures of his ribs, all of which occurred no more than four weeks before his death with most occurring much closer to his death. Other than the hemorrhage which caused his death, Jeremiah had suffered two previous brain hemorrhages, one being several days old and the other being several hours old. Expert testimony established the time of Jeremiah's death was most likely between 4 a.m. and 5 a.m. The experts concluded, therefore, the injury occurred one-half hour to one hour prior to death or between 3:00 a.m. and 4:30 a.m. [Nissly] testified he worked on his motorcycle engine on the evening of April 17 [the evening before the child's death] until 2:30 or 3:00 a.m. of the next morning. The others in the house at the time, [Nissly's] wife, two daughters, father, grandfather and two cousins, had gone to bed earlier. When [Nissly] finished working on the engine, he went inside to go to bed but found his wife up with their two daughters who were crying. [Nissly] tried to help his wife calm down the girls but they would not stop crying. Jeremiah was downstairs in the living room in his bassinet crying so [Nissly] moved him to the family room which was further away from the upstairs bedroom, next to the garage. Jeremiah usually slept in the living room and [Nissly] put him back in the living room after moving him to the family room because [Nissly] felt uneasy about leaving him in the family room. Jeremiah continued to cry but less loudly after [Nissly] held him so [Nissly] went upstairs to bed. He was last with the child between 3:30 and 3:40 a.m. He was awakened at 7 a.m. by his father saying something was wrong with Jeremiah. When

[Nissly] went down to check the baby, he was dead." *Commonwealth v. Nissly,* 549 A.2d at 919.

In upholding Nissly's conviction of murder in the third degree the Superior Court reviewed *Paquette, supra.* holding that:

"An inference of guilt is permissible where the infant had been in the *sole* custody of the suspect and the injuries were inflicted *during that time." Id.,* 549 A.2d at 920. (emphasis in the original)

*Webster's Third New International Dictionary, Unabridged* defines "sole" as having no companion, solitary, lonely; having no sharer, being the only one; functioning independently and without assistance or interference. That definition and all of the cases addressing the sole custody inference make it patently clear that the inference may be applied *only* in those circumstances in which one adult had sole custody of the child at the time when the child suffered injuries that were not accidental or self-inflicted.

In *Nissly* the medical testimony established a very narrow window of time during which the fatal trauma occurred, that being between 3:00 a.m. and 4:30 a.m. The evidence indicated that Nissly was the only person in custody of Jeremiah at that time, despite the fact that other people were in the household.

The first case cited by the Commonwealth in support of the sole custody inference was *Commonwealth v. Rogers,* 265 Pa. Super. 535, 528 A.2d 610 (1987). That case was cited in the Commonwealth's preliminary hearing memorandum which was given to the district justice who conducted the preliminary hearing, and was subsequently made a part of the record in this matter. This court has read *Rogers.* The court is perplexed by the Commonwealth's reliance on *Rogers* in support of the

sole custody inference, given that *Rogers* does not mention nor address the sole custody inference. While *Rogers* relates to the prosecution of the parents of a young daughter for involuntary manslaughter, recklessly endangering another person, and endangering the welfare of a child, the case primarily concerns itself with the introduction of expert testimony regarding the "battered child syndrome." It is not a foundation upon which to base a sole custody inference prosecution.

While it is without question that a prosecution and conviction may be based upon sufficient circumstantial evidence, this court cannot ignore and is obligated to follow the holdings of the Supreme Court of Pennsylvania and the Superior Court of Pennsylvania. This court has been able to find no cases from either of those courts which permit the sole custody inference to be used when more than one person has had custody of a child when that child has suffered injuries that were not self-inflicted or accidental. The only testimony which this court has before it to consider regarding this issue is the transcript of the preliminary hearing. There is no testimony contained in that transcript which indicates that Steven Derk had sole custody of Clair F. Hoyles, III, at the time that young Clair suffered any injuries, let alone fatal ones that would permit this Court to make a finding that the Commonwealth had established even a *prima facie* case, a case on the face of it, that the defendant was responsible for the death of young Clair.

For the reasons set forth above this court will enter an order which grants the defendant's motion to quash Counts 1, 2 and 3 of the information, the charges of murder of the first degree, murder of the third degree, and aggravated assault, respectively.

Count 4 of the information charges the defendant with endangering welfare of children, 18 Pa.C.S. §4304, which provides that:

"A parent, guardian or other person supervising the welfare of the child under 18 years of age commits a misdemeanor of the first degree if he knowingly endangers the welfare of the child by violating a duty of care, protection or support."

At the preliminary hearing uncontradicted testimony was presented to the effect that over a period from approximately July 1, 1992, until the date of the child's death Mr. Derk, either by himself, or in conjunction with Ms. Gates was in the position of supervising the welfare of Clair, who was under the age of 18. The Supreme Court of Pennsylvania when interpreting 18 Pa.C.S. §4304, as it was written in 1974, held that the statute "is basically protective in nature ... designed to cover a broad range of conduct in order to safeguard the welfare and security of our children," and that those statutes must be interpreted by making reference to those broad protective purposes and the common sense of the community. *Commonwealth v. Mack,* 467 Pa. 613, at 618, 359 A.2d 770, at 772 (1976).

As noted previously in this opinion, no testimony was offered at the preliminary hearing as to acts of an assaultive nature committed by Derk upon the child. However, a person may endanger the welfare of children by acts of omission as readily as by acts of commission. *Commonwealth v. Miller,* 410 Pa. Super. 275, 600 A.2d 988 (1992). *Commonwealth v. Cardwell,* 357 Pa. Super. 38, 515 A.2d 311 (1986), *allocatur denied,* 515 Pa. 573, 527 A.2d 535 (1987).

In the instant case the testimony of Dr. Ross makes it clear that many of the injuries that Clair sustained had been sustained days if not weeks before the date of his death, and that those injuries should have been visible to any caring adult. In *Cardwell, supra,* the Superior Court wrote:

"We hold that evidence is sufficient to prove the intent element of the offense of endangering the welfare of a child, 18 Pa.C.S. §4304, when the accused is aware of his or her duty to protect the child; is aware that the child is in circumstances that threaten the child's physical or psychological welfare; and has either failed to act or has taken actions so lame or meager that such actions cannot reasonably be expected to be effective to protect the child's physical or psychological welfare." *Id.,* 515 A.2d at 315.

While Derk was not Clair's father, and had no legal relationship to him, the testimony established that he stood in *loco parentis* and had, in the past, supervised Clair's welfare. As noted above, the testimony established that the nature of Clair's injuries should have been evident to anyone exercising reasonable supervision of Clair. The testimony at the preliminary hearing regarding what was apparently a final act of responsibility by Derk as to Clair was to call the ambulance at a time which was too late to save Clair's life. The testimony, when considered as a whole, makes out a prima facie case that the defendant did endanger the welfare of Clair, as that final act was "so lame or meager" that it could not reasonably be expected to be effective in protecting Clair.

The final count of the information, Count 5, charges the defendant with recklessly endangering another person. 18 Pa.C.S. §2705. A person violates this section if he or she:

"Recklessly engages in conduct which places or may place another in danger of death or serious bodily injury."

It is again necessary to note that no testimony is before the court that would permit the court to find that a prima facie case is made out that the defendant recklessly engaged in acts of *commission* which placed Clair in danger of death or serious bodily injury. The inquiry then becomes one of whether an act of *omission,* recklessly engaged in, is a violation of this section. 18 Pa.S.C. §302(b)(3) provides that:

"A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation."

In *Commonwealth v. Howard,* 265 Pa. Super. 535, 402 A.2d 674 (1979) the defendant was the mother of the minor child, the mother having been convicted of involuntary manslaughter. Involuntary manslaughter involves causing the death of another "as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner, or the doing of a lawful act in a reckless and grossly negligent manner." 18 Pa.C.S. §2504. The mother was found guilty of involuntary manslaughter as a result of her failure to protect her daughter from abuse by the mother's boyfriend. The court finding that:

"When a parent sees her helpless child being beaten and abused over a period of time, she is not permitted

to sit back and wait until the child is in obvious need of medical attention before acting—the duty is to prevent the harm." *Commonwealth v. Howard,* 402 A.2d at 676, n.2 (1979).

This court finds that logic to be appealing in this circumstance. The injuries that Clair was sustaining were grievous. They involved serious bodily injury, and ultimately death. As noted above, Derk had been charged with Clair's care, and was in a position to protect Clair. Derk's alleged failure to do so, as established by the testimony at the preliminary hearing, makes out a prima facie case of omission.

For these reasons the court will deny the defendant's motion to quash as to Count 5.

An order consistent with this opinion will be entered.

### ORDER

And now, May 3, 1993, it is hereby ordered:

(1) Counts 1, 2 and 3 of the information filed against the defendant are hereby dismissed, the court having found that the Commonwealth has failed to establish a prima facie case on those counts against the defendant.

(2) The defendant's motion to quash as to Counts 4 and 5 of the information is denied.

(3) In light of the charges that remain pending against the defendant and the fact that the most serious offense that remains pending is a misdemeanor of the first degree punishable by up to five years in prison, a $10,000 fine or both, the defendant's bail is hereby reduced to $50,000.