J-A17010-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| ALI MARSH, | |
| Appellant | No. 2442 EDA 2015 |

Appeal from the Judgment of Sentence March 13, 2015
in the Court of Common Pleas of Philadelphia County
Criminal Division at No.: CP-51-CR-0005820-2012

BEFORE:  GANTMAN, P.J., LAZARUS, J., and PLATT, J.[*]

MEMORANDUM BY PLATT, J.:                    **FILED AUGUST 11, 2016**

Appellant, Ali Marsh, a/k/a Jabbar Rice,[1] appeals from the judgment of

sentence imposed following his jury conviction of murder of the first degree,[2]

attempted murder,[3] robbery,[4] burglary,[5] conspiracy,[6] possessing instruments

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] In addition to Jabbar Rice, Appellant has also used the names Hakeem
Marsh, John Moore, and Richard Marshall.  (**See** N.T. Trial, 9/26/14, at 130).

[2] 18 Pa.C.S.A. § 2502(a).

[3] 18 Pa.C.S.A. § 901.

[4] 18 Pa.C.S.A. § 3701.

[5] 18 Pa.C.S.A. § 3502.

[6] 18 Pa.C.S.A. § 903.

of crime,[7] and violations of the Uniform Firearms Act (VUFA).[8]  The trial court imposed a sentence of life imprisonment, plus a consecutive term of not less than fifty-six years nor more than one-hundred-twelve years of incarceration.  Appellant challenges the denial of a motion to suppress, the denial of a mistrial, evidentiary rulings, and the weight and sufficiency of the evidence.  We affirm, in part on the basis of the trial court opinion.

In its opinion, the trial court fully and correctly sets forth the relevant facts and procedural history of this case.  (**See** Trial Court Opinion, 10/21/15, at 1-7).  Therefore, we have no reason to restate them at length here.

However, for context and the convenience of the reader, we note briefly that Appellant's judgment of sentence stemmed from his jury conviction of first degree murder and the other charges already noted, based on his participation in an unsuccessful home invasion robbery.

On March 5, 2012, shortly after 3:00 a.m., Appellant and his co-conspirator Charles Davis[9] broke into the home of John Paul Sr., and his

_____

[7] 18 Pa.C.S.A. § 907.

[8] 18 Pa.C.S.A. § 6106 (firearms not to be carried without a license); 18 Pa.C.S.A. § 6108 (firearms not to be carried on the streets of Philadelphia).

[9] Davis also went by the names Charles Williams, and Charles White. (**See** N.T. Trial, 9/24/14, at 55, 91; N.T. Trial, 9/25/14, at 16).  Appellant testified that Davis is his longtime friend and cousin. (**See** N.T. Trial, 9/26/14, at 128-29).

wife, Sherrel, and demanded money. When told there was none, they fatally shot Mr. Paul. They also shot his wife, Sherrel, about a dozen times, but she survived, although she required multiple surgeries and still carries bullets and bullet fragments within her.

Appellant was also shot in the leg during the melee. The bullet moved down his left leg to his ankle. He was bleeding profusely. The co-conspirators fled by car. A neighbor of the Pauls heard the gunfire and saw the conspirators depart. Davis and Appellant rendezvoused with Davis' wife, Nicole Walton. Sometime during this trip Appellant called his then-girlfriend, Nija Pasture. At trial, Pasture testified that Appellant told her that "shit went bad" and he got shot. (N.T. Trial, 9/25/14, at 68).

Appellant needed medical attention for the bullet wound in his ankle, but did not want to risk apprehension in a Philadelphia hospital, so Walton drove him (and Davis) to Union Hospital in Elkton, Maryland. Appellant checked in using the name Jabbar Rice. However, he was soon transferred to a hospital in Christiana, Delaware for treatment.

Still using the name Jabbar Rice, Appellant told Delaware hospital personnel that he had been robbed, and shot, in Delaware. Maryland state trooper Alan Flaugher was dispatched to investigate the shooting. He soon realized that Appellant had given him a false name. Nevertheless, he identified Appellant through FBI fingerprint records, and linked him to the murder in Philadelphia. Delaware police, now assisted by Philadelphia homicide detective John Harkins, obtained a search warrant to have blood

drawn from Appellant. DNA testing later confirmed that blood on the Paul's porch and on the street outside belonged to Appellant. Appellant checked out of the hospital before the scheduled removal of the bullet, apparently against medical advice.

A day or two later he appeared at Ms. Pasture's residence. She took him to buy some clothes and they began moving from one hotel to another until a few days later when they were apprehended.

The trial court denied Appellant's motion to suppress the results of the blood test, as well as the motion to exclude, as inflammatory, photographs of Mr. Paul and the crime scene. Over Appellant's objection, the trial court allowed Walton's testimony that when she picked up her husband, Davis, he told her, "We got into some shit and Jabbar ( Appellant) got shot," under the co-conspirator exception. (N.T. Trial, 9/24/14, at 59).

Also during trial, after his counsel finished cross-examining Appellant's girlfriend, Nija Pasture, a lawyer sitting in the courtroom as a spectator, said to Appellant's counsel, "Why did you cross examine her? She didn't hurt you." (N.T. Trial, 9/25/14, at 137). Appellant's counsel made a motion for a mistrial which the trial court denied. After Appellant's conviction, his counsel filed a post-sentence motion (including a challenge to the weight of the

evidence) which was denied by operation of law. (***See*** Order, 7/14/15). This timely appeal followed.[10]

Appellant presents six questions on appeal.

1. Did the [t]rial [c]ourt err when it denied Appellant's motion to suppress the seizure of Appellant's blood and the fruits of that search based on the fact that the search warrant utilized therein was based upon material misstatements made by law enforcement?

2. Did the [t]rial [c]ourt abuse its discretion when it denied Appellant's request to preclude certain inflammatory photographs of the decedent and crime scene herein from being shown to the jury?

3. Did the [t]rial [c]ourt abuse its discretion when it overruled the Appellant's objection to witness Nicole Walton's testimony containing a hearsay statement from Appellant's co-defendant under the co-conspirator exception to the rule against hearsay?

4. Did the [t]rial [c]ourt abuse its discretion in refusing to grant Appellant a mistrial when spectating attorney made prejudicial and inflammatory comments to Appellant's counsel in the presence of the jury?

5. Did the [t]rial [c]ourt err when it denied Appellant's [p]ost-[s]entence [m]otion and found that the evidence presented at trial was legally sufficient to sustain a verdict of guilty on all charges against the Appellant?

6. Did the [t]rial [c]ourt abuse its discretion when it denied Appellant's [p]ost-[s]entence [m]otion and found that the jury's verdict was not against the clear weight of the evidence?

_____

[10] Appellant filed a statement of errors complained of on appeal, and a court-ordered supplement. The trial court filed an opinion on October 21, 2015. ***See*** Pa.R.A.P. 1925.

- 5 -

(Appellant's Brief, at 7-8).

In his first claim, Appellant argues that the search warrant used to authorize collection of his blood samples was invalid. (*See* Appellant's Brief, at 29-39). He asserts the warrant was based on a deliberate and material misstatement in the affidavit from police, namely, that he received the wound in his ankle "because the injured suspect was reportedly shot by another one of the suspects while both were on a staircase within the [victims'] residence." (*Id.* at 37 (quoting N.T. Trial, 9/23/14, at 8)).

Appellant focuses on the single word "reportedly." He posits that: "Given that this 'report' did not exist and was a factual fabrication, the statements Detective Harkins gave to Delaware detectives to be used in their affidavit of probable cause were misstatements of fact." (*Id.* at 37) (internal quotation marks in original ). We disagree.

> Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. ***Commonwealth v. Bomar***, 573 Pa. 426, 826 A.2d 831, 842 (2003). Where, as here, the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, "whose duty it is to determine if the suppression court properly applied the law to the facts." ***Commonwealth v. Mistler***, 590 Pa. 390, 912 A.2d 1265, 1269 (2006) (quoting

- 6 -

> ***Commonwealth v. Nester****,* 551 Pa. 157, 709 A.2d 879, 881 (1998)). Thus, the conclusions of law of the courts below are subject to our plenary review. ***Mistler, supra; Commonwealth v. Morley****,* 545 Pa. 420, 681 A.2d 1254, 1256 n. 2 (1996).

***Commonwealth v. Jones***, 988 A.2d 649, 654 (Pa. 2010).

> Our scope of review of a suppression court's ruling is confined primarily to questions of law.  We are bound by findings of fact which are supported by the record; we may reverse only if the court's legal conclusions are in error.  As the parties herein agree on the facts, we are asked to determine only the legal implications of those facts.

***Commonwealth v. Sharp***, 683 A.2d 1219, 1221-22 (Pa. Super. 1996).

> In determining whether probable cause exists to issue a search warrant, Pennsylvania applies the "totality of the circumstances" test as set out in ***Illinois v. Gates****,* 462 U.S. 213 [ ] (1983) and adopted in ***Commonwealth v. Gray****,* [ ] 503 A.2d 921 (Pa. 1985).  The duty of an appellate court is to ensure that the magistrate had a substantial basis for concluding that probable cause existed.  We are guided by these standards:

>> An affidavit for a search warrant is to be tested by this court with common sense and a realistic manner, and not subjected to overly technical interpretations; the magistrate's determination of probable cause is to be accorded great deference on review.  The law is clear that before a search warrant may issue, facts supported by oath or affirmation must be presented to the issuing officer which will justify a finding of probable cause.  For the warrant to be constitutionally valid, the issuing officer must conclude that probable cause exists at the time the warrant is issued.  Such a conclusion may not be made arbitrarily and must be based on facts which are closely related in time to the date the warrant is issued.

***Id.*** at 1223 (some citations and internal quotation marks omitted).

Here, we observe that the Commonwealth argues Appellant's first claim is waived. (**See** Commonwealth Brief, at 12). On independent review, we agree.

Although he calls into question the sufficiency of the affidavit of probable cause, Appellant failed to ensure that the certified record included the actual affidavit, precluding us from meaningful review of the totality of the circumstances under which the search warrant was issued. Accordingly, we agree with the Commonwealth that the first claim is waived. **See Commonwealth v. Preston**, 904 A.2d 1, 6 (Pa. Super. 2006), *appeal denied*, 916 A.2d 632 (Pa. 2007) (appellate court is limited to considering only materials in certified record when resolving an issue; any document which is not part of the officially certified record is deemed non-existent).

Moreover, on the available record, the claim would not merit relief. (**See** N.T. (Motion), 9/23/14, at 7-8). There is no dispute that the affidavit was not based on a formal, written report, but on the oral reports of the police officers investigating the crime scene. (**See id.** at 11-12).

Therefore, the legal question we are asked to resolve is whether the affidavit in support of the search warrant is invalid as a matter of law. However, as already noted, Appellant has not provided us with the affidavit, presenting only an abbreviated quotation which contains the allegedly inadequate word "reportedly." (**Id.** at 8). The notion that use of the adverb "reportedly" imports an assertion that a formal written report exists finds no

support in controlling authority or ordinary English usage, and Appellant offers none. (**See** Appellant's Brief, at 37-39).

We review the issue of a search warrant in a "common sense and a realistic manner, and not subject[ ] to overly technical interpretations." **Sharp**, **supra** at 1223. Appellant's argument ignores all of these requirements. His claim of a material misstatement in the supporting affidavit based on the insertion of the word "reportedly" lacks foundation in law or fact. It is, accordingly, frivolous. Even if not waived, Appellant's first issue would lack merit.[11]

In his second claim, Appellant asserts that the photographs of Mr. Paul and the crime scene should not have been shown to the jury. He argues their probative value was outweighed by their prejudicial effect. (**See** Appellant's Brief, at 40-43). We disagree.

"[Q]uestions concerning the admissibility of evidence are committed to the sound discretion of the trial judge, whose rulings will not be disturbed on

_____

[11] We decline to review Appellant's subordinate claim (not included as a separate question), that the evidence should have been suppressed without a separate hearing or that he was entitled to a hearing under **Franks v. Delaware**, 438 U.S. 154 (1978). (**See** Appellant's Brief, at 29-39). We agree with the trial court that Appellant failed to meet his burden. (**See** Trial Ct. Op., at 10). Citing the **omitted** affidavit, Appellant claims Detective Harkins gave a false statement that "someone had reported" Appellant was shot. (Appellant's Brief, at 36). We conclude this claim falls far short of "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." **Franks**, **supra** at 155-56. No **Franks** hearing was required or necessary.

appeal absent an abuse of that discretion." ***Commonwealth v. Reed****,* 990 A.2d 1158, 1167 (Pa. 2010), *cert. denied*, 562 U.S. 1020 (2010) (citations omitted).

The trial court explained its reasoning, and the precautions it took to avoid prejudice, in its opinion.  (***See*** Trial Ct. Op., at 12).  We discern no basis on which to disturb the trial court's proper exercise of its discretion.  Appellant's second claim lacks merit.

In his third claim, Appellant disputes the admissibility of the statement by Charles Davis, "We got into some shit and Jabbar (Appellant) got shot," as testified to by Nicole Walton, under the co-conspirator exception. (Appellant's Brief, at 51; ***see also id.*** at 44-51; N.T. Trial, 9/24/14, at 59).  We disagree.

The trial court explains that the statement was admissible under the exception to the hearsay rule provided at Pennsylvania Rule of Evidence 803(25)(E) ("made by the party's coconspirator during and in furtherance of the conspiracy").  (***See*** Trial Ct. Op., at 13).  The trial court notes further that, under controlling authority, statements made during flight or the concealment of evidence are in furtherance of the conspiracy.  (***See id.*** at 13-14) (citing cases).

A statement dealing with flight from the crime scene falls within the co-conspirator's exception.  ***See Commonwealth v. Lambert***, 603 A.2d 568, 575 (Pa. 1992) (co-conspirator's statement in car during flight after

murder admissible under co-conspirator exception); *see also* ***Commonwealth v. Chester***, 587 A.2d 1367, 1375 (Pa. 1991) (holding statement made after murder properly admitted under co-conspirator's exception to hearsay rule; concealment integral part of crime); ***Commonwealth v. Smith***, 513 A.2d 1371, 1375 (Pa. 1986), *cert. denied*, 480 U.S. 951 (1987) (statements made in course of flight from scene of crime and dividing proceeds of robbery "certainly" part of common design to carry out robbery; statements in question properly admitted as having been made in course of carrying out design of conspiracy).  Appellant's third claim lacks merit.

Appellant's fourth claim challenges the denial of a mistrial after an attorney who was observing the trial questioned defense counsel about why he cross-examined Appellant's girlfriend, Nija Pasture, who testified for the Commonwealth.  The observing attorney said, "Why did you cross examine her?  She didn't hurt you."  (Appellant's Brief, at 53 (citing N.T. Trial, 9/25/14, at 139)).  Counsel asked for a mistrial, which the trial court denied.  Appellant argues the comment created a reasonable likelihood of prejudice.  (***See*** Appellant's Brief, at 52-55).  We disagree.

"The decision to grant a mistrial is within the sound discretion of the trial court.  This remedy is an extreme one, and is required only when an incident is of such a nature that its unavoidable effect is to deprive the appellant of a fair and impartial trial." ***Commonwealth v. Johnson***, 719

A.2d 778, 787 (Pa. Super. 1998) (*en banc* ) (citations and internal quotation marks omitted), *appeal denied*, 739 A.2d 1056 (Pa. 1999).

In this case, Appellant maintains that the spectator "opined that the chances of the jury finding Appellant to be innocent were somehow lessened after Nija Pasture had been cross-examined." (Appellant's Brief, at 53).  In an overlapping second argument, Appellant also asserts that the attorney's comment provided an opinion that his case had been damaged by his counsel's cross-examination.  (**See id.**).  We find no support for these speculations in law or in fact.

Notably, Appellant offers no authority in support of either of his claims, aside from cases cited for general principles.  (**See id.** at 52-53).  The trial court confirms that counsel for Appellant never requested a colloquy of each of the jurors to determine what, if anything, a juror may have heard.  (**See** Trial Ct. Op. at 17).  Without corroboration or controlling caselaw, Appellant's assessment about what the jury may have heard, amounts to no more than unsupported speculation about what the jury might have thought.[12]

In any event, Appellant concedes that the observing attorney made no comment on any particular fact of the case.  (**See** Appellant's Brief, at 53).

_____

[12] The trial court concludes that "it is unlikely that the jury [heard the comment] because it was made while the jury was being escorted out of the court room."  (Trial Ct. Op., at 17).

- 12 -

Even assuming for the sake of argument that the jury (or some members of the jury) may have heard the comment, all they would have heard was the observing lawyer's personal opinion that Ms. Pasture's testimony **did not** hurt Appellant. Appellant was not "deprived of a fair and impartial trial." **Johnson**, **supra** at 787. The trial court denied a mistrial, deciding that Appellant failed to demonstrate a reasonable likelihood of prejudice. (**See** Trial Ct. Op., at 17). We agree. Appellant's fourth claim does not merit relief.

In his fifth claim, Appellant challenges the sufficiency of the evidence on all charges. (**See** Appellant's Brief, at 8). He argues, *inter alia*, that Mrs. Paul could not make an identification, and he notes that his DNA, while located in blood outside of the victims' residence, was not found inside. (**See id.** at 56-59). However, none of these arguments were included in his statement of errors complained of on appeal, which consisted solely of a generic, boilerplate claim of insufficiency. (**See** Supplemental Concise Statement of Matters Complained of on Appeal," 10/02/15, at 2 ¶ 5). The trial court suggests that we deem Appellant's sufficiency claim waived. We agree.

> In reviewing the sufficiency of the evidence, we view all the evidence admitted at trial in the light most favorable to the Commonwealth, as verdict winner, to see whether there is sufficient evidence to enable the jury to find every element of the crime beyond a reasonable doubt. **Commonwealth v. Clark**, 746 A.2d 1128 (Pa. Super. 2000) (*en banc*). "This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of

- 13 -

the evidence links the accused to the crime beyond a reasonable doubt." ***Commonwealth v. Sanders****,* 426 Pa.Super. 362, 627 A.2d 183, 185 (1993) (citation omitted). Although a conviction must be based on "more than mere suspicion or conjecture, the Commonwealth need not establish guilt to a mathematical certainty." ***Commonwealth v. Badman****,* 398 Pa. Super. 315, 580 A.2d 1367, 1372 (1990) (citation omitted). "Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence." ***Commonwealth v. Wright****,* 846 A.2d 730, 736 (Pa. Super. 2004).

***Commonwealth v. Gainer****,* 7 A.3d 291, 292 (Pa. Super. 2010), *appeal denied*, 23 A.3d 1055 (Pa. 2011).

In a recent decision, ***Commonwealth v. Williams****,* 959 A.2d 1252 (Pa. Super. 2008), this Court reiterated that when challenging the sufficiency of the evidence on appeal, the Appellant's 1925 statement must "specify the element or elements upon which the evidence was insufficient" in order to preserve the issue for appeal. ***Williams****,* 959 A.2d at 1257 (quoting ***Commonwealth v. Flores****,* 921 A.2d 517, 522–23(Pa. Super. 2007)). Such specificity is of particular importance in cases where, as here, the Appellant was convicted of multiple crimes each of which contains numerous elements that the Commonwealth must prove beyond a reasonable doubt. ***Id.****,* at 1258 n.9. Here, Appellant not only failed to specify which elements he was challenging in his 1925 statement, he also failed to specify which convictions he was challenging.

\* \* \*

Further, Appellant's sufficiency of the evidence argument is underdeveloped. Appellant does not state in his brief, which of the convictions he is challenging. He does not set forth the elements of the crimes he was convicted of and does not argue which specific elements were not met.

***Commonwealth v. Gibbs****,* 981 A.2d 274, 281 (Pa. Super. 2009), *appeal denied*, 3 A.3d 670 (Pa. 2010) (concluding sufficiency claim waived).

- 14 -

As in **Gibbs**, Appellant's claim is waived. Moreover, we note on independent review that even though Appellant in his brief challenges all the elements of all the charges of which the jury convicted him, his argument consists of little more than a cursory reference to Mrs. Paul's lack of identification, a categorical denial of flight to avoid apprehension, and the purported lack of evidence of a conspiracy. (**See** Appellant's Brief, at 56-59). The arguments are undeveloped and bereft of citations to pertinent supporting case authority. Even if not waived, his challenge to sufficiency would not merit relief.

Similarly, in his final claim, Appellant challenges the weight of the evidence. (**See** Appellant's Brief, at 60).

> Our standard of review for a challenge to the weight of the evidence is well-settled: The finder of fact is the exclusive judge of the weight of the evidence as the fact finder is free to believe all, part, or none of the evidence presented and determines the credibility of the witnesses. As an appellate court, we cannot substitute our judgment for that of the finder of fact. Therefore, we will reverse a jury's verdict and grant a new trial only where the verdict is so contrary to the evidence as to shock one's sense of justice. A verdict is said to be contrary to the evidence such that it shocks one's sense of justice when "the figure of Justice totters on her pedestal," or when "the jury's verdict, at the time of its rendition, causes the trial judge to lose his breath, temporarily, and causes him to almost fall from the bench, then it is truly shocking to the judicial conscience." Furthermore, where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.

*Commonwealth v. Cruz*, 919 A.2d 279, 281-82 (Pa. Super. 2007), *appeal denied*, 928 A.2d 1289 (Pa. 2007) (citations omitted).

Here, in a one page argument, under the guise of avoiding unnecessary repetition, Appellant purports to incorporate his insufficiency argument into his weight claim. (**See** Appellant's Brief, at 60).

Leaving aside the technical deficiencies and lack of merit of Appellant's sufficiency argument, the attempt to adopt sufficiency claims in a challenge to the weight of the evidence is procedurally inappropriate. **See Commonwealth v. Birdseye**, 637 A.2d 1036, 1039-40 (Pa. Super. 1994), *affirmed*, 670 A.2d 1124 (Pa. 1996) (noting sufficiency claims distinct from weight claims; deeming weight claim waived for failure to present separate argument regarding weight). Here, Appellant's weight claim is waived.

Moreover, it would not merit relief. The trial court declined to upset the verdict of the jury, noting the blood containing Appellant's DNA on the porch and the street at the crime scene, his flight from Philadelphia to seek medical treatment for his gunshot wound at a remote location out-of-state, his inculpatory statement to his then-girlfriend, and the inculpatory statement of his co-conspirator. The trial court found that Appellant's explanation for his presence at the crime scene was "simply ludicrous." (Trial Ct. Op., at 23). We discern no abuse of discretion in the trial court's rejection of Appellant's weight claim. Appellant's sixth claim does not merit

relief.  In addition to the reasons explained in this memorandum, we affirm on the basis of the trial court opinion, which we attach for reference.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/11/2016

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION**

COMMONWEALTH OF PENNSYLVANIA     :     COURT OF COMMON PLEAS
:     OF PHILADELPHIA
:
VS.     :     CRIMINAL TRIAL DIVISION
:
:     CP-51-CR-0005820-2012

ALI MARSH

CP-51-CR-0005820-2012 Comm. v. Marsh, Ali
Opinion

7360004331

**OPINION**

FILED
OCT 2 0 2015
Criminal Appeals Unit
First Judicial District of PA

**PROCEDURAL HISTORY**

Ali Marsh, the above-named defendant, was charged as of the above Bill and Term number with, *inter alia*, murder, generally, attempted murder, aggravated assault, burglary, robbery, criminal conspiracy, carrying a firearm prohibited, carrying a firearm without a license, carrying a firearm on a public street, possessing an instrument of crime, generally. These charges stem from an incident that occurred on March 5, 2012, during which appellant and Charles Davis illegally entered the home of the Paul family to burglarize it and rob its occupants. During the incident, John Paul, Sr. was shot and killed and his wife Sherrell was shot numerous times and severely injured.

Following the denial of a motion to suppress physical evidence and jury selection, Defendant's trial commenced on September 23, 2014. On September 30, 2014, the jury found defendant guilty of first-degree murder, attempted murder, robbery burglary the weapons offenses set forth above, and criminal conspiracy. Sentencing was deferred until March 13, 2015, on which date this Court imposed an aggregate sentence of life imprisonment plus fifty-six to

1

one-hundred twelve years' incarceration, which aggregate sentence was ordered to be served consecutive to the life sentence imposed on the first-degree murder charge. Following the imposition of sentence, appellant filed a notice of appeal and a requested Pa.R.A.P. 1925(b) Statement.[1]

## FACTUAL HISTORY

On March 5, 2012, shortly after 3:00 a.m., John Paul Sr., his wife Sherrel, and their two sons were asleep inside their home located at 3213 Cecil B. Moore, Avenue in Philadelphia when defendant and Charles Davis broke into the residence. John Paul, Sr., who was awakened by the sound of the intruders entering the residence, exited his bedroom to investigate and in the hallway outside his bedroom he encountered defendant and Davis. Mr. Paul was shot when he confronted the two men after which Mr. Paul began screaming to warn his wife. However, because of the severity of the wound, he was no longer able to speak or fight off defendant and Davis.

Mr. Paul's screaming awoke Ms. Paul and she went into the hallway where she confronted Davis and defendant. One of the intruders shot her and she collapsed to the floor unable to move her lower extremities. As she crawled toward her son's bedroom to protect them one of the men picked her up and began repeatedly demanding that she tell him where the money was. There was no money however, and Davis dropped her to the floor at which time they fired numerous rounds into her body.

The two perpetrators then left the residence at which time John Paul, Jr. called the police as he was trying to comfort his parents. They arrived soon thereafter and transported the two

---

[1] This Court directed defendant to file a supplemental 1925(b)n statement containing references to the record where the alleged errors contained in his original 1925(b) statement could be found. Defendant complied with this request.

shooting victims to a nearby hospital where Mr. Paul was pronounced dead.[2] Despite having been shot numerous times and having twenty-six specific bullet wounds, Mrs. Paul survived. She was unable to identify either of the intruders during a photographic identification session.

John Paul Jr., was also awakened by the gunfire and upon going into the hallway he saw his father get shot by a man he described as being black, about 5'10," 200 pounds, dressed in all black, with hood pulled tight around his face, which was visible. He also had a beard. In total, he heard approximately ten gunshots. After the two men left his home, John Paul Jr. saw the man who shot his father get into a car.

An investigation of the scene resulted in the seizure of twelve spent cartridge cases scattered on the steps and the second floor of the residence. An examination of the cartridge cases revealed that six of them were .40 caliber and six .45 caliber and that each of the .40 caliber cartridges and the .40 caliber cartridges had been fired from separate weapons of the same calibers.

Police also recovered five spent projectiles one of which was .40 caliber and the remainder .45 caliber. Although the .45 caliber cartridges had similar characteristics, testing could not determine whether they had been fired from the same gun.

Police also collected several blood samples collected from various locations in the residence and submitted them to a DNA lab for testing. That testing revealed that some of the blood collected in the residence came from Mr. and Mrs. Paul. Police also observed a trail of blood that began on the porch of the Paul residence and led to the street. DNA testing of that blood revealed that it had come from defendant.

---

[2]An autopsy of Mr. Paul's body indicated that he died as a result of a contact gunshot wound to his chest that caused internal bleeding. The manner of death was deemed to be homicide.

3

Ms. Angela McCray, a neighbor of the Pauls, was awakened by the gunfire. When she looked out her front bedroom window, she saw two men crouched in front of her van. A car then drove up and one of the men helped the second male to get into the vehicle, after which it was driven away by

Nija Pasture, defendant's girlfriend at the time of the incident, received a phone call from defendant in the early morning hours of the day of the incident.[3] He told her that something had gone "bad," which Pasture assumed referred to a botched robbery because defendant had recently said to her that he was short of money, and that he had been shot. Defendant then handed his phone to Nicole Walton, Charles Davis' wife, and she said she did not know what had happened to defendant and was driving him to a hospital.

A couple of days later, defendant appeared at the home of Pasture's grandparents. He was on crutches and had rods in his leg. Over the next several days defendant had Pasture take him to various motels in Pennsylvania and New Jersey because he said he could not walk up the steps of his residence. Pasture checked him in using her name. Although Pasture asked him how he had gotten shot, he declined to speak about it. Defendant also began using a different phone. Pasture tended to defendant for several days until he was arrested on March 10, 2012, inside the Marriott hotel in Plymouth meeting, Pennsylvania. Incident to defendant's arrest, police seized, *inter alia*, a number of false identification cards for defendant.

Nicole Walton received a telephone call from Davis at about 3:30 a.m., on March 5, 2012, asking her to come and pick him up in the area of 50th Street and Greenway Avenue.[4]

---

[3] Pasture was charged with conspiracy and hindering apprehension for helping defendant. She entered a negotiated guilty plea to those charges promising her a probationary sentence in exchange for her testimony.

[4] Walton was on state parole at the time. As a result of her having assisted defendant and Davis and because she illegally left Pennsylvania, she was declared a parole violator and was ordered to serve fourteen months'

4

Walton drove to that location at which time, Davis and defendant, who had a gunshot wound to his foot that was bleeding profusely, got into her car at which time someone in the car told her to drive to a hospital. When Walton said she was going to a nearby hospital she was directed to get on "the expressway" and drive to a hospital in Maryland. During the ride Walton was told to tell hospital personnel that defendant was a victim of a robbery and that he had been shot during the robbery. Upon arrival at the hospital, Walton did as she was directed after which she and her husband began driving back to their home after defendant was admitted into the hospital under the name Jabbar Rice after which he was transferred to Christiana Hospital in Delaware.

While returning home, Ms. Walton received a telephone call from a Maryland State trooper, who asked her to meet him at Christiana Hospital. After dropping Davis off in Chester, Pennsylvania, she went to Christiana Hospital and told the Maryland State trooper Alan Flaugher that defendant had called her earlier that morning and asked her to pick him up because he had been shot during a robbery and together with a Charles White, who, in actuality was her husband Charles Davis, they drove defendant to the hospital in Delaware.

Subsequent thereto, Walton was interviewed by Philadelphia Homicide detectives and she initially lied to police lied. She told them that Davis, who she identified as her boy friend, was in bed with her when the incident herein occurred. She also tried to hide the fact that her husband had called her several times before she picked him up.

After being given Miranda warnings and waiving the rights covered by those warnings, Walton proceeded to tell police that Davis had called her and asked her to come and pick him up. When she arrived at the location Davis mentioned, he told her that, "'We got into some shit and

---

incarceration. She also was charged by Philadelphia authorities with, *inter alia*, hindering apprehension but those charges were withdrawn.

5

Jabbar got shot."[5] Walton conceded that she was not entirely truthful while giving her statement because she was trying to protect her husband.

Trooper Flaugher also spoke to defendant, who said his name was Jabbar Rice, at Christiana Hospital. The trooper summarized what defendant told him as follows:

> The defendant told me that he was dropped off at a female's house. He believed it was in Bear, Delaware, and was there for approximately a half hour and then had walked outside of that residence, and while he was outside he was approached by a black male wearing dark clothing. This male pointed a gun at him and said give it up and stole money from him, his watch and his wallet, which contained his Pennsylvania identification card.

N.T. 9/25/14, 12.

After speaking to defendant Trooper Flaugher performed a records check of the name defendant gave him and did not find anyone with that name. He returned to the hospital and fingerprinted defendant. He then faxed the prints to the FBI, which advised him that the prints matched those of defendant. After further investigation, the trooper learned that Ali Marsh was a suspect in a shooting in Philadelphia and he related what he had learned in his discussions with Walton and defendant.

Philadelphia Homicide Detective John Harkins was part of the team assigned to investigate the crime herein. After checking local hospitals in Philadelphia for shooting victims and coming up empty he widened his search and learned that a shooting victim had been transferred from a hospital in Maryland to Christiana Hospital. The detective thereafter spoke to Trooper Flaugher and was told about what the trooper had learned during his investigation of the shooting of defendant. Detective Harkins and other detectives travelled to Christiana Hospital and after obtaining a search warrant, he obtained blood samples from defendant for purposes of a

---

[5] Defendant also used the name Jabbar.

6

DNA comparison. The detective also received defendant's clothing from Trooper Flaugher and observed a CT scan of the bullet lodged in defendant's ankle that indicated that the bullet was 10.1 millimeters long.[6]

Detective Harkins also interviewed Walton. It quickly became apparent that she was lying about Davis having been home in bed with her after the detective checked her phone records which indicated that she received several phone calls from him after the incident occurred. When confronted with this information she said Davis had given his phone to defendant.

A check of Charles Davis' and defendant's cell phone records showed that defendant called Davis at 2:05 a.m. and that Davis was in the area of City Line Avenue at the time. The records then show that Davis' phone then travelled from that area to an area in Southwest Philadelphia and then to an area where it was detected by a cell phone tower near where the incident herein occurred. Following that the phone travelled back to Southwest Philadelphia, then to Elkton, Maryland, where it was detected by a cell tower situated on the property of the hospital defendant was driven to by Walton, and then to Chester, Pennsylvania.

Defendant's phone records mirrored those pertaining to Davis' phone and showed that he called Davis and took the phone from Southwest Philadelphia to the area where the incident occurred, back to Southwest Philadelphia, and then to Elkton, Maryland.

## DISCUSSION

In his 1925(b) statement, defendant first asserts that this Court erred by denying his Motion to Suppress the two draws of his blood because the affidavit of probable cause contained

---

[6] The bullet was going to be removed from defendant's leg in a subsequent medical procedure but he checked himself out of the hospital against medical advice on March 6, 2012, before that procedure could be performed. Defendant's medical records indicated that he suffered a gunshot to his left leg that fractured his tibia and fibula and that the bullet lodged in his ankle. The size of the bullet was consistent with a forty caliber projectile.

7

an averment not supported by any evidence. Specifically, in Paragraph 11 of the affidavit contained information provided by Detective Harkins indicating that the detective reasonably believed that defendant was shot inside the residence on a staircase by another suspect. According to defendant, there was no information in any of the discovery material provided him by the Commonwealth to substantiate the information provided by Detective Harkins that one suspect was shot by a confederate.

"Probable cause to issue a search warrant has been defined as those facts reasonably necessary to show (1) that the items sought are connected with criminal activity, and (2) that the items will be found in the place to be searched." Commonwealth v. Gray, 469 A.2d 169, 173 (Pa. Super 1983), aff'd, 503 A.2d 921 (Pa. 1985), *quoting* Commonwealth v. Kanouff, 462 A.2d 251, 252 (Pa. Super 1983). "In determining whether probable cause exists to issue a search warrant, Pennsylvania applies the 'totality of the circumstances' test as set out in Illinois v. Gates, 462 U.S. 213 (1983), and adopted in Commonwealth v. Gray, 503 A.2d 921 (Pa. 1985). Commonwealth v. Sharp, 683 A.2d 1219, 1223 (Pa. Super 1996)." The duty of a court reviewing the issuance of a search warrant is "to ensure that the magistrate had a substantial basis for concluding that probable cause existed." Gray, 503 A.2d at 925.

Misstatements of fact in a search warrant affidavit will invalidate a search warrant and require suppression only if they are deliberate and material. Commonwealth v. Gomolekoff, 910 A.2d 710 (Pa. Super. 2006); Commonwealth v. Mickell, 598 A.2d 1003 (Pa. Super. 1991) See also, Commonwealth v. Zimmerman, 422 A.2d 1119, 1124 (Pa. Super. 1980). In Commonwealth v. Antoszyk, 985 A.2d 975, 982 (Pa. Super. 2009), the Superior Court ruled that a non-deliberate, nonmaterial misstatement did not by itself invalidate a search warrant and held "it is well-settled that courts may uphold a warrant if an independent basis exists to support a

finding of probable cause; however, these cases also provide that a court must invalidate a search warrant if the sole basis for finding probable cause is the material misstatements." To succeed with such a claim, a defendant "must establish that the police (1) made a misstatement of fact, which is both (2) deliberate and (3) material". Id. A material fact is defined as "one without which probable cause to search would not exist." Zimmerman, 422 A.2d at 1124.

In Franks v. Delaware, 438 U.S. 154 (1978) the United States Supreme Court held a defendant may attack the issuance of a warrant if based on untruthful information. Id. at 428 U.S. at 171. In requiring a truthful basis for the issuance of a warrant, the Court explained:

> [t]his does not mean "truthful" in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily....To succeed in attacking a warrant, a defendant must come forward with "allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof."

Id. at 171, 98 S.Ct. 2674. Thus, "while the mere presence of an error in an affidavit of probable cause supporting a search warrant does not invalidate the warrant, such a misstatement of fact will invalidate the warrant if it is deliberate and material (a material fact being one without which probable cause to search would not exist)." Commonwealth v. Baker, 24 A.3d 1006, 1018 Pa. Super. 2011). Moreover, "[t]he question of whether a misstatement was deliberately made is to be answered by the lower court." Id.

Finally, under Franks, a defendant who seeks suppression of evidence based on allegedly false statements in an affidavit of probable cause has the burden of making a substantial preliminary showing that the affidavit includes a false statement made knowingly and intentionally or with reckless disregard for the truth. Once this *prima facie* showing is made

through affidavits and an offer of proof, only then is a defendant entitled to a hearing on the issue. Franks, at 171-72. See also Commonwealth v. Miller, 518 A.2d 1187, 1193 (Pa. 1986) (summarizing holding of Franks).

Relief should be denied with respect to this claim because defendant failed to meet his burden of proving that Detective Harkins made an intentionally false statement or that he had a reckless disregard for the truth. Based on the discovery of a blood trail from the door of the residence where the incident occurred to the street and the absence of evidence indicating that the blood trail was left by either of the victims or that anyone inside the house fired a gun, the detective had a reasonable basis for assuming that the blood trail was left by a perpetrator of the crime and that he was shot by another perpetrator. Thus, no error was committed by rejecting this claim in denying defendant's motion to suppress.

In addition, even if defendant had met his burden of proving that Detective Harkins made a material misrepresentation, relief was properly denied him because the remaining information contained in the affidavit was more than sufficient to establish probable cause. It clearly provided the magistrate with sufficient information to conclude that defendant likely was a source of the blood trailing from the victims' residence. Accordingly, it is respectfully suggested that defendant be denied relief with respect to this claim.

Next, defendant raises two claims involving the admission of evidence over the objection of the defense. "As a general rule, questions concerning the admissibility of evidence are committed to the sound discretion of the trial judge, whose rulings will not be disturbed on appeal absent an abuse of that discretion." Commonwealth v. Reed, 990 A.2d 1158, 1167 (Pa. 2010). An abuse of discretion is not merely an error in judgment but a gross misapplication of

10

the law, manifestly unreasonable judgment, or demonstrable bias or partiality. Commonwealth v. Kubiac, 550 A.2d 219, 223 (Pa. Super. 1988).

In his first attack on a ruling made by this Court defendant asserts that this Court committed an abuse of discretion by overruling an objection to the introduction of certain photographs in evidence. (N.T. 9/23/14, 175-185). These photographs, marked Exhibits 1-S, 1-NN, 1-QQ, and 1-UU, should not have been admitted in evidence, according to defendant, because they "were unnecessarily inflammatory and could only have served to prejudice the jurors against defendant." Defendant's Supplemental 1925(b) Statement, Issue 2.

With regard to the admission of photographs, the Court in Commonwealth v. Patterson, 91 A.3d 55 (Pa. 2014) stated:

> In determining whether to admit a photograph or videotape of a murder victim, a trial court must engage in a two-step analysis. First, the court must determine whether the photograph is inflammatory. If it is not, the photograph may be admitted if it has relevance and can assist the jury's understanding of the facts. If the photograph is inflammatory, the court must determine whether the essential evidentiary value of the photograph outweighs the likelihood that the photograph will improperly inflame the minds and passions of the jury.

Patterson, 91 A.3d at 67 (citation omitted).

Our Supreme Court has noted:

> A criminal homicide trial is, by its very nature, unpleasant, and the photographic images of the injuries inflicted are merely consonant with the brutality of the subject of inquiry. To permit the disturbing nature of the images of the victim to rule the question of admissibility would result in exclusion of all photographs of the homicide victim, and would defeat one of the essential functions of a criminal trial, inquiry into the intent of the actor. There is no need to so overextend an attempt to sanitize the evidence of the condition of the body as to deprive the Commonwealth of opportunities of proof in support of the onerous burden of proof beyond a reasonable doubt.

11

Commonwealth v. Tharp, 830 A.2d 519, 531 (Pa. 2003) (quoting Commonwealth v. McCutchen, 454 A.2d 547, 549 (Pa. 1982)).

Instantly, this Court took great care to admit only what was necessary to show the location of the wounds and the blood smears. First, photograph S-1, which was a photograph of the decedent, was a black and white photograph wherein the decedent's face was blacked out, was introduced to establish specific intent to kill. (N.T. 9/23/14, 178-180). Because the photograph was black and white and the question of intent was not immediately apparent from the evidence, it was clear to this Court that the probative value of the sanitized photo outweighed any prejudicial effect it may have had on the jury.

The remainder of the photographs depicted blood stains found inside and on the exterior of the victims' residence. (N.T. 9/23/14, 181-183). These photographs were clearly relevant to show the movement of the defendant and the victims during the incident. Moreover, the photographs were not overly gruesome or inflammatory and it was highly unlikely that showing the jury the photographs would prevent it from making an objective review of the evidence.

In conclusion, the photographs in this case enhanced the jury's full understanding of the crime and therefore, their probative value outweighed any inflammatory effect they may have had on the jury. Accordingly, no relief should be forthcoming with respect to this claim.

Third, defendant complains that this Court committed an abuse of discretion when it overruled an objection to testimony indicating that Charles Davis told Nicole Walton that, "'We got into some shit and Jabbar got shot." (N.T. 9/24/14, 57-59). Defendant asserts that this Court should have sustained an objection to this testimony because it was hearsay inadmissible under any exception to the hearsay rule.

12

The Pennsylvania Rules of Evidence recognize the co-conspirator's exception to the hearsay rule, which applies when a statement is offered against an opposing party and the statement was made by the party's co-conspirator during and in furtherance of the conspiracy. Pa.R.E. 803(25)(E) (statement offered against party that was made by co-conspirator of party during course of conspiracy and in furtherance of it is not excluded by hearsay rule); Commonwealth v. Zdrale, 608 A.2d 1037, 1039 (Pa. 1992) ("The co-conspirator exception allows the introduction of statements made by a co-conspirator, if they were made during the conspiracy, in furtherance thereof, and where there is other evidence of the existence of the conspiracy."). See generally, Commonwealth v. Lambert, 603 A.2d 568, 575 (Pa. 1992) ("inculpatory statements made by co-conspirators in their own presence following a crime have a strong indicia of spontaneity and reliability so as to comport with confrontation requirements") (citation omitted); Commonwealth v. Timer, 609 A.2d 572, 575 (Pa. Super. 1992) ("During the course of a conspiracy, each conspirator is considered the agent of the other, and thus a statement by one is an admission by all.").

With respect to the introduction of evidence under the co-conspirator exception, the Commonwealth is only required to prove the existence of a conspiracy by a fair preponderance of the evidence. Commonwealth v. Pinkins, 525 A.2d 1189, 1191 (Pa. 1987). "[A]conspiracy, for purposes of the co-conspirator exception, may be inferentially established by showing the relation, conduct or circumstances of the parties." Id.

In addition, the law is clear that a conspiracy may include statements made during flight or during the course of concealing evidence. See, e.g., Commonwealth v. Chester, 587 A.2d 1367, 1375 (Pa. 1991) (where concealment of evidence was part of conspiracy, co-conspirator statements admissible), cert denied, 502 U.S. 959 (1991); Commonwealth v. Smith, 513 A.2d

13

1371, 1375 (Pa. 1986) (statement made by co-conspirator in course of flight from crime properly admitted under exception to hearsay rule permitting admission of declaration of co-conspirator), cert. denied, 480 U.S. 951 (1987); Commonwealth v. Coccioletti, 425 A.2d 387, 392 (Pa. 1981) (statements "made in the course of concealing evidence and in furtherance of the common design" properly admitted under co-conspirator exception); Commonwealth v. Basile, 458 A.2d 587, 591 (Pa. Super. 1983) ("[T]he fact that the 'central objective' of the conspiracy has been nominally attained does not preclude the continuance of the conspiracy. Where there is evidence that the conspirators originally agreed to take certain steps after the principal objective of the conspiracy was reached, or evidence from which such agreement may reasonably be inferred, the conspiracy may be found to continue."); Commonwealth v. Cofer, 390 A.2d 1363, 1365 (Pa. Super. 1978) ("an act such as flight from the scene of a crime by one co-conspirator ... must rightfully be considered part of the [r]es gestae of the conspiracy and, in furtherance thereof").

Here, a review of the record clearly establishes that the Commonwealth presented sufficient evidence to prove by a preponderance of the evidence that defendant and Davis entered into multiple conspiracies that included robbing the victims and hindering their apprehension given their activities following the commission of the crime, which included evading authorities and seeking treatment for defendant's gunshot wound.[7] Davis made the remark in the course of having Walton drive defendant to a hospital so that he could obtain treatment for the gunshot wound he suffered during the incident. Thus, the admission of testimony in question was

---

[7] The essence of a criminal conspiracy is a common understanding, no matter how it came into being, that a particular criminal objective be accomplished. Commonwealth v. Carter, 416 A.2d 523, 524 (Pa. Super. 1979); Commonwealth v. Anderson, 402 A.2d 546, 549 (Pa. Super. 1979); Commonwealth v. Henderson, 378 A.2d 393, 398 (Pa. Super. 1977). "The crime by its very nature is frequently not susceptible of proof except by circumstantial evidence. 'A conspiracy may be inferentially established by showing the relationship, conduct or circumstances of the parties, and the overt acts on the part of co-conspirators have uniformly been held competent to prove that a corrupt confederation has in fact been formed.' Commonwealth v. Horvath, 144 A.2d 489, 492 (Pa. Super. 1958)."

14

properly admitted because it was made while Davis was attempting to facilitate his and defendant's flight and for the purpose of concealing evidence of the crime. See, e.g., Commonwealth v. Dreibelbis, 426 A.2d 1111, 1115-16 (Pa. 1981) (object of conspiracy, which was murder, did not terminate conspiracy, and in their flight and efforts to conceal their identities, conspirators acted in furtherance thereof, thereby providing no obstacle to admission of certain co-conspirator's inculpatory statements); Coccioletti, 425 A.2d at 392 ("declarations ... made in the course of concealing evidence and in furtherance of common design of evading capture" properly admitted under co-conspirator exception to hearsay rule). Therefore, the statement was properly admitted in evidence.

Even had the testimony in question been erroneously admitted, it is submitted that relief should still be denied defendant because the resulting error was harmless. A review of the remaining evidence presented at trial was more than sufficient to establish defendant's guilt given that it established that defendant clearly had been at the scene of the crime, that he was shot there, and that he sought treatment for his wounds. See, e.g., Commonwealth v. Rivera, 773 A.2d 131, 138-39 (Pa. 2001) (improper admission of co-defendants' statements was harmless error in light of the overwhelming evidence against defendant, which included the testimony of two eyewitnesses, who identified him as the shooter); Commonwealth v. Miles, 681 A.2d 1295, 1301 (Pa. 1996) ("considering the overwhelming evidence of Miles' guilt, including his confession and eyewitness testimony, it is clear beyond a reasonable doubt that the error is harmless"). Accordingly, for all of the foregoing reasons, defendant's claim with respect to these issues should be denied.

In his penultimate claim, defendant argues that this Court committed an abuse of discretion when it refused to grant a mistrial after an attorney in the court room asked defense

15

counsel why he cross-examined Nija Pasture when defense counsel completed his cross-examination of her. (N.T. 9/25,12, 136-139). Defendant submits that a mistrial should have been granted because the jury may have heard counsel's remark thereby prejudicing defendant.

The remedy of a mistrial is required "only when an incident is of such a nature that its unavoidable effect is to deprive the appellant of a fair and impartial tribunal." Commonwealth v. Johnson, 719 A.2d 778, 787 (Pa. Super. 1998) (*en banc*), quoting Commonwealth v. Montgomery, 626 A.2d 109, 112-113 (Pa. 1993). The decision granting or denying a motion for a mistrial is reviewed under an abuse of discretion standard. Commonwealth vs. Lettau, 955 A.2d 360 (Pa. Super. 2008), *reversed on other grounds*, 986 A.2d 114 (Pa. 2009). An abuse of discretion "is not merely an error of judgment," but a ruling that is "manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will." Commonwealth v. Chambers, 685 A.2d 96, 104 (Pa. 1996).

There is no question that an extraneous influence may compromise the impartiality and integrity of the jury. See Carter by Carter v. U.S. Steel Corp., 604 A.2d 1010, 1015-16 (Pa. 1992) (plurality). The relevant inquiry is whether the extraneous influence caused "a reasonable likelihood of prejudice." Id. at 1016; see also Commonwealth v. Bradley, 459 A.2d 733, 739 (Pa. 1983) (requiring showing that contact between member of the jury and court officer resulted in "a reasonable likelihood of prejudice" to defendant.). In making the "reasonable likelihood of prejudice" determination, the court must consider: "(1) whether the extraneous influence relates to a central issue in the case or merely involves a collateral issue; (2) whether the extraneous influence provided the jury with information they did not have before them at trial; and (3) whether the extraneous influence was emotional or inflammatory in nature." Carter, 604 A.2d at 1017 (footnote omitted). The burden is on the party claiming prejudice. Id.

16

While the comment herein was inappropriate, defendant failed to demonstrate that there was a reasonable likelihood that it prejudiced him. While this Court heard the comment, it is unlikely that the jury did because it was made while the jury was being escorted out of the court room. Moreover, the defense never requested a colloquy of each of the jurors so his claim that the jurors were influenced by the remark rests on pure speculation. In addition, the remark was innocuous and did not concern a central issue in the case. Based on the foregoing, it is therefore suggested that defendant's assertion that this Court committed an abuse of discretion when it denied his motion for a mistrial be deemed lacking in merit.

Defendant lastly contends that this Court "erred when it denied by operation of law defendant's post-sentence motion for a new trial and/or an arrest of judgment because the evidence was insufficient to convict appellant of first degree murder and the other charges, further the jury verdict was against the weight of the evidence." Defendant's Supplemental Pa.R.A.P. 1925(b) Statement of Matters, Issue 5. It is suggested that this claim be deemed waived because it consists of mere "boilerplate" and is too vague for this Court to ascertain what defendant is asserting. Specifically, it fails to specify why the evidence is insufficient or against the weight of the evidence.

> [W]hen issues are too vague for the trial court to identify and address, that is the functional equivalent of no concise statement at all. Rule 1925 is intended to aid trial judges in identifying and focusing upon those issues which the parties plan to raise on appeal. Commonwealth v. Lemon, 804 A.2d 34, 37 (Pa. Super.2002). Thus, Rule 1925 is a crucial component of the appellate process. Id. "When the trial court has to guess what issues an appellant is appealing, that is not enough for meaningful review." Id., citing Dowling, supra.

Commonwealth v. Smith, 955 A.2d 391, 393 (Pa. Super. 2008) (en banc) (citation omitted). In Commonwealth v. Manley, 985 A.2d 256 (Pa. Super. 2009), appeal denied, 606 Pa. 671, 996 A.2d 491 (2010), the Court stated:

> In Commonwealth v. Williams, 959 A.2d 1252, 1257 (Pa. Super. 2008), this Court stated, "[i]f Appellant wants to preserve a claim that the evidence was insufficient, then the 1925(b) statement needs to specify the element or elements up on which the evidence was insufficient. This Court can then analyze the element or elements on appeal."

Manley, 985 A.2d 261-262. "As this Court stated in Williams, the 1925(b) statement is required to determine '[w]hich elements of which offense[s] were unproven? What part of the case did he Commonwealth not prove?'" Manley, 985 A.2d at 262, quoting Williams, 959 A.2d at 1257.

Similar waiver rules apply to vague weight of the evidence claims set forth in 1925(b) statements. See Commonwealth v. Seibert, 799 a.2d 64, 62 (Pa. Super. 2002) (appellant's weight of the evidence issue waived for having filed a vague Rule 1925(b) statement, to wit, "[t]he verdict of the jury was against the weight of the credible evidence as to all charges.")

If this Court's view that defendant's claims be deemed waived is not adopted, review should be denied in any event because a review of the claims establishes that they both lack merit. With respect to his sufficiency claim, defendant asserted in his post-sentence motion that the evidence was insufficient to sustain his myriad convictions because no one saw him enter the victims' residence, there was no eyewitness testimony, the testimony was inconsistent and contradictory regarding defendant's actions following the crime's commission, the verdicts rest on speculation and conjecture regarding defendant's involvement in the crime, and the verdict finding defendant participated in the incident herein rests on speculation and conjecture.

Although defendant phrased these assorted claims as challenges to the sufficiency of the evidence, in actuality, many of defendant's assertions apply to weight of the evidence claims. In

18

*Commonwealth v. Brown*, 52 A. 3d 1139 (Pa. 2012), the Supreme Court intimated that sufficiency claims predicated on mere inconsistencies in the testimony are generally to be regarded not sufficiency of evidence claims but claims involving challenges to the weight of evidence. Consequently, those contentions challenging the reliability of the testimony or the credibility of the witnesses do not entitle defendant to relief on sufficiency grounds

Although many of the assertions defendant claims renders the evidence insufficient are more suited to claims challenging the weight of the evidence, this Court recognizes that there is a body of law holding that the evidence is insufficient when the "evidence offered to support a verdict of guilt is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture...." *Commonwealth v. Karkaria*, 533 Pa. 412, 419, 625 A.2d 1167, 1170 (1993); See also *Commonwealth v. Farquarson*, 354 A.2d 545, 550 (Pa. 1976). Nevertheless, the principle enunciated in these cases, has been limited to instances where the evidence presented by the party bearing the burden of proof is either so unreliable or contradictory so as to render any verdict predicated thereon the result of conjecture or surmise. *Farquarson*, 354 A.2d at 550; *Commonwealth v. Holmes*, 406 A.2d 510 (Pa. 1979). Assuming that defendant is relying on this body of law to support his claim, insofar as his 1925(b) statement does not so indicate, he still would not be entitled to any relief.

In assessing the sufficiency of evidence, the court must view the evidence in the light most favorable to the verdict winner – in this case, the Commonwealth. *Commonwealth v. Boczkowski*, 846 A.2d 75, 80 (Pa. 2004). Both direct and circumstantial evidence, along with all reasonable inferences arising therefrom from which the finder of fact could properly have based its verdict, must be accepted as true and sufficient to support the challenged conviction. *Commonwealth v. Perez*, 931 A.2d 703, 706-7 (Pa. Super. 2007); *Commonwealth v. Johnson*,

719 A.2d 788 (Pa. Super. 1998), *appeal denied.* The finder of fact may believe all, part, or none of the evidence regarding the question of whether reasonable doubt existed, and the facts and circumstances need not be incompatible with the defendant's innocence. Commonwealth v. Derr, 841 A. 2d 558, 559 (Pa. Super. 2004). Finally, a mere conflict in the evidence does not render the evidence insufficient because it is the duty of the fact finder to determine the weight to be given the testimony and the jury may believe all, part or none of the evidence. Commonwealth v. Walter, 849 A.2d 265, 267 (Pa. Super. 2004) (citing Commonwealth v. Verdekal, 506 A.2d 415 (Pa. Super. 1986); Commonwealth v. Whitfield, 380 A.2d 362 (Pa. 1977)).

Instantly, the evidence was not so contradictory or inconsistent to call into question the reliability of the verdict. The evidence presented by the Commonwealth clearly demonstrated beyond a reasonable doubt that the defendant willfully and deliberately acted with a specific intent to kill the victim. In addition, it proved, albeit circumstantially, beyond a reasonable doubt that defendant was inside the victims' residence and that he was a participant in the gruesome events that occurred therein. First, there was DNA evidence collected at the scene that matched defendant's DNA. Second, the evidence proved that two guns were used during the commission of the crime, that two individuals participated in it, and that a bullet matching the bullets fired from one of those guns rested in defendant's leg. Third, defendant's actions in the minutes and hours after the crime evince consciousness of guilt. That evidence included his flight to Maryland, the creation of a story to explain the gunshot wound to his leg, his flight from the hospital against medical advice, and his frequent change of places to stay. Fourth, phone records placed phones registered to defendant and his co-defendant in close proximity to one another and in the area of the incident before, during, and following the incident. Finally, both defendant's

co-defendant and defendant himself conceded that they had run into a problem when queried about defendant's leg injury. All of this evidence was more than sufficient to sustain his conviction.

In addition, the law is clear that flight can be used as a factor in assessing guilt. Commonwealth v. Davalos, 779 A.2d 1190, 1194(Pa. Super. 2001) (a fact finder can consider flight indicative of a consciousness of guilt). Moreover, "'[t]here is no requirement that a homicide...be proven by eyewitness testimony.'" Commonwealth v. Lee, 626 A.2d 1238, 1240 (Pa. Super. 1993) (citation omitted); Commonwealth v. Hardcastle, 546 A.2d 1101, 1107-08 (Pa. 1988), cert. denied, 493 U.S. 1093 (1990) (same). Also, "[c]ircumstantial evidence itself can be sufficient to prove any element or all of the elements of a criminal homicide." Santiago, 980 A.2d 659, 662 (Pa. Super. 2006). In Santiago, supra, 980 A.2d at 663, the Court held that the totality of evidence, although circumstantial, was sufficient to find the accused guilty of first degree murder and related offenses because it established that he argued with the victim over the victim's refusal to let him hold a gun, that a neighbor heard two shots, and then saw defendant walk out of victim's house, that the victim was discovered on a couch with gunshot wound to head, and that defendant asked another individual to hold a gun for him. A similar ruling was issued in Hardcastle, 546 A.2d at 1108, wherein despite the lack of eyewitness testimony, first-degree murder convictions were upheld in view of the totality of circumstantial evidence consisting of witnesses' testimony placing defendant outside by victim's car, then on victim's porch with door open, and then running from victim's house after which the bodies of the victim and a woman, both of whom had been repeatedly stabbed, were found.

In the instant case the evidence establishing guilt is as compelling and inculpatory, if not more so, than in the above cited cases. Thus, if it should be determined that defendant did not

21

waive review of this claim because of his defective 1925(b) statement, it is suggested that he be denied relief with respect to his sufficiency claim.[8]

A claim that the verdict is against the weight of the evidence asserts that the verdict shocks one's sense of justice. Commonwealth v. Vandivner, 962 A.2d 1170, 1177 (Pa. 2009). "A motion for a new trial on the grounds that the verdict is contrary to the weight of the evidence concedes that there is sufficient evidence to sustain the verdict; thus the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner." Commonwealth v. Widmer, 744 A.2d 745, 751 (Pa. 2000) (citation omitted). "An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court." Id. at 751-752. Finally, it is exclusively for the finder of fact to determine the credibility of witnesses, and he may believe all, part, or none of the evidence presented. Commonwealth v. Dreibelbis, 426 A.2d 1111, 1113 (1981).

Instantly, while there were some inconsistencies and contradictions in the testimony, they do not shock the conscience or call into doubt the reliability of the verdict especially given, *inter alia*, the blood found at the scene came from defendant, defendant's flight from Philadelphia following the incident to receive treatment outside Philadelphia ostensibly to stay off the radar of the police, and his comment to his then girlfriend that his gunshot wound occurred when something went "bad." What the evidence showed that went "bad" was the scheme to enter the Pauls' residence and rob them. In addition, the inconsistencies between the testimony given by Mrs. Paul and her son regarding the descriptions they gave of the perpetrators likely was easily

---

[8] In this Court's view, defendant's sufficiency claim did not require a discussion concerning whether the Commonwealth's evidence particularly established each element of the crimes defendant was convicted of committing. Other than baldly stating that there were no eyewitnesses and that the Commonwealth failed to prove the material elements of the crime in his post-sentence motion, defendant failed to point to any specific element of the crimes in question he believes was not established by the evidence beyond a reasonable doubt.

22

reconciled by the jury given that Mrs. Paul was shot numerous times and left to die and her son was traumatized by having to tend to his dying parents. Finally, defendant's explanation about what he was doing in the area of the shooting was simply ludicrous. Thus, it is suggested that defendant's weight of the evidence claim be denied because it is clear that the rejection of defendant's weight claim did not amount to an abuse of discretion.

## CONCLUSION

For the foregoing reasons, the defendant's assertions of error should be dismissed for lack of merit and the judgment of sentence entered in this matter should be affirmed.

By the court,

DATE: 10/20/15

Honorable Jeffrey P. Minehart

23